**UNITED STATES**

v.

**Staff Sergeant John D. MARRIE, FR264–67–3798, United States Air Force.**

**ACM 29953.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 23 Dec. 1991.

Decided 18 April 1994.

---

Appellate Counsel for Appellant: David M. Lewis, Jr. (argued), Colonel Terry J. Woodhouse, Colonel Jay L. Cohen, Lieutenant Colonel Frank J. Spinner, Major Mary C. Yastishock, and Captain Gilbert J. Andia, Jr.

Appellate Counsel for the United States: Major John H. Kongable (argued) and Colonel Jeffery T. Infelise.

Before HEIMBURG, PEARSON, and SCHREIER, Appellate Military Judges.

## OPINION OF THE COURT

HEIMBURG, Senior Judge:

A general court-martial, sitting with officer and enlisted members, convicted appellant of sodomy on males under age 16, indecent acts and indecent liberties with males under age 16, and false swearing, in violation of Articles 125 and 134, UCMJ, 10 U.S.C. §§ 925, 934 (1988). His approved sentence is a dishonorable discharge, confinement for 20 years, forfeiture of all pay and allowances, and reduction to E–1.

Appellant initially asserted ten errors for our consideration, but he withdrew his ninth and tenth assignments of error in light of the Supreme Court decision in *Weiss v. United States*, —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994). We have considered the remaining eight assignments of error and, finding no error prejudicial to the appellant's substantial rights, affirm the findings and sentence.

### Denial of Adequate Pretrial Discovery in Article 32 Hearing

Appellant asserts his Article 32, UCMJ, 10 U.S.C. § 832 (1988), investigating officer denied him the statutory right to adequate pretrial discovery by arbitrarily finding that witnesses were unavailable to testify at the hearing. He asks us to set aside the findings and sentence and order a new Article 32 investigation, asserting that the "summary nature" of his hearing deprived him of adequate opportunity to prepare for trial.

None of the five juvenile victims named in the charges appeared at the Article 32 hearing. The hearing officer declared them "unavailable" and, as a consequence, considered their previous sworn, written statements. *See* R.C.M. 405(g)(4)(B). Two victims lived near the location of the hearing, but their parents refused to allow them to attend. The three other victims lived more than 100 miles from the hearing site. The hearing officer determined the availability of these three witnesses by applying a *per se* "100 mile rule." *See* R.C.M. 405(g)(1)(A). Nothing in the record of trial or allied papers persuades us that the parents of these three boys were ever asked to have their sons testify at the hearing. Appellant objected to the victims not appearing and being subject to cross-examination on the basis that it violated his substantial right of pretrial discovery under Article 32.

At trial appellant asked the military judge to order a new Article 32 investigation because the hearing officer considered the victims' written statements. She denied the motion, finding the hearing officer did not abuse his discretion in admitting statements of witnesses who were unavailable under R.C.M. 405(g)(1)(A).

Before 1991, R.C.M. 405(g)(1)(A) reflected the well established concept of determining witness availability by balancing the significance of the witness' testimony against the relative difficulty and expense of obtaining the witness' presence at the hearing. *See United States v. Ledbetter*, 2 M.J. 37, 44 (C.M.A.1976); *see also United States v.*

*Chestnut,* 2 M.J. 84, 85 (C.M.A.1976) (error to assume a civilian witness was unavailable because she lived and worked more than 50 miles from the hearing). *Ledbetter* based the balancing requirement on an accused's Article 32(b) right to a "full opportunity ... to cross-examine witnesses against him if they are available."

On 6 July 1991, R.C.M. 405(g)(1)(A) was amended by Change 5 to the MANUAL FOR COURTS–MARTIAL, UNITED STATES, 1984 (MCM). Exec. Order No. 12767, 56 Fed.Reg. 30288–89 (1991). The amended rule says: "A witness is 'reasonably available' when the witness is located within 100 miles of the situs of the investigation and the significance of the testimony and personal appearance of the witness outweighs the difficulty, expense, delay, and effect on military operations of obtaining the witness' appearance." (Added language is underlined.)

Appellate government counsel argue that this change to R.C.M. 405(g)(1)(A) created a *per se* rule of unavailability: a witness located more than 100 miles away is unavailable regardless of his willingness to appear and the significance of the testimony. The "analysis" which accompanied the 1991 change gives this view some support. It states the amendment "add[s] a requirement that a witness be located within 100 miles of the [hearing] to be 'reasonably available.'" The "analysis" is ambiguous, however, for it also states that production of witnesses from beyond 100 miles "is within the discretion of the witness' commander (military witnesses) or the commander ordering the investigation (civilian witnesses)." Moreover, the analysis to the MCM is only evidence of the intent of the drafters of the change, not of the intent of the President in promulgating it. *United States v. Rexroat,* 38 M.J. 292, 298 (C.M.A. 1993); MCM Analysis, A21–3.

■ In interpreting this or any rule of procedure contained in the MCM, we must consider the limits of the President's power. The President promulgated R.C.M. 405(g)(1)(A) pursuant to his power to prescribe rules for pretrial procedures. Article 36, UCMJ, 10 U.S.C. § 836 (1988). Rules prescribed under Article 36 which are "not

contrary to, nor inconsistent with, the Uniform Code ... [have] the force of law." *United States v. Redding,* 11 M.J. 100, 110 (C.M.A.1981). *See also United States v. Kelson,* 3 M.J. 139, 141 (C.M.A.1977). On the other hand, when a rule of procedure conflicts with the UCMJ, the statute takes precedence. *United States v. McFadden,* 19 U.S.C.M.A. 412, 42 C.M.R. 14, 1970 WL 6966 (1970). Thus, we are mindful that we should, if possible, interpret a procedural rule in a manner consistent with the UCMJ. *Cf. United States v. Johnson,* 17 M.J. 251, 253 (C.M.A.1984).

■ To interpret the language added by the 1991 change, we must read it in the context of the whole. We begin with the plain language of the rule. R.C.M. 405(g)(1)(A) does not forbid calling a witness from beyond 100 miles. Neither does it define which witnesses are *not* available. Rather, it says witnesses *are available* when they meet two criteria: they are within 100 miles and the balancing test favors appearance. Nothing in the rule's language requires or permits the arbitrary decision that a witness more than 100 miles away is unavailable solely because of the distance involved. In other words, the decision whether any witness is "available" to testify at the hearing remains an exercise of *discretion.*

■ Turning to the facts of this case, the investigating officer correctly found that the two local witnesses were unavailable. The refusal of a witness not subject to subpoena to attend a hearing makes that witness unavailable. *Cf. United States v. Hampton,* 33 M.J. 21 (C.M.A.1991). When the witness is a juvenile, we have no doubt the parents possess the authority to decide whether the witness will appear.

We reach a different finding on the distant witnesses. The hearing officer applied the wrong legal standard when he decided that witnesses located beyond 100 miles "were, by definition, not reasonably available" under R.C.M. 405(g)(1)(A). Because of his determination that distance alone dictated availability, he failed to articulate any facts which could support a decision under the balancing test of R.C.M. 405(g)(1)(A). Likewise, the

military judge relied solely on distance, so we are left without a basis for applying an "abuse of discretion" test to her decision. *Cf. United States v. Roberts,* 10 M.J. 308, 310 (C.M.A.1981). We will, therefore, assume error. It remains for us to determine the impact of this error.

In *United States v. Chuculate,* 5 M.J. 143, 145–46 (C.M.A.1978), the Court of Military Appeals established that an accused who wishes to preserve the right to cross-examine a witness at the Article 32 hearing must move to take that witness' testimony by deposition. Absent such a request or a finding of prejudice, " '. . . there is no good reason in law or logic to set aside his conviction.' " *Id.* (quoting *United States v. Mickel,* 9 U.S.C.M.A. 324, 26 C.M.R. 104, 107 (1958).

■ Appellant's trial defense counsel did not ask the hearing officer to take any witness' testimony by deposition. At an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (1988), session of the court-martial held more than a month before trial, defense counsel complained he did not have access to the juvenile witnesses but did not request any depositions. The military judge instructed the prosecutor to ensure the defense had access to the witnesses before trial, and, when the court reconvened 36 days later, defense counsel assured the military judge that he had interviewed all the children with his expert consultant present as an observer.

We find the appellant did not preserve his pretrial rights by requesting a deposition of the witnesses, and he was not prejudiced at trial by the Article 32 investigating officer's failure to apply the correct rule of witness availability.

## Instruction on Spillover

At trial, appellant moved to sever the charges relating to AS, a nine-year old victim, and those involving the remaining victims, all teenagers. Defense counsel argued that there was improper joinder of charges because: (1) there was no factual connection between the charges relating to AS and the others, (2) AS was the strongest witness, and (3) appellant would be prejudiced by the "spillover" effect of the stronger evidence— the evidence of the offenses involving AS

would imply appellant was predisposed to commit the other offenses. *See United States v. Hogan,* 20 M.J. 71 (C.M.A.1985).

The military judge found no improper joinder and denied the defense motion. The defense counsel later told the military judge that he would request an instruction on spillover. He did not follow up with a request, and the military judge gave no such instruction. Appellant now asserts the military judge erred by not giving a spillover instruction *sua sponte.* He has not challenged the military judge's ruling on severance.

The Court of Military Appeals has recognized a spillover effect in a few limited cases. *See United States v. Curry,* 31 M.J. 359 (C.M.A.1990); *United States v. Haye,* 29 M.J. 213 (C.M.A.1989); and *Hogan.* One might postulate that in any case in which an accused faces multiple charges of similar offenses there is some risk of spillover. However, the risk of spillover is not the test for a grant of severance. *See Curry,* 31 M.J. at 372–73; R.C.M. 906(b)(10). Similarly, that risk does not require a military judge to give tailored instructions to guard against spillover in every case.

■ We conclude that the risk of spillover in this case does not rise to the level of prejudice that concerned the Court of Military Appeals in the cases cited above. In reaching this conclusion, we examined the military judge's ruling on severance and considered the connection between joinder of the offenses and spillover. Appellant has not challenged the military judge's ruling on severance, and we believe for good reason: Joinder of these offenses did not unduly prejudice appellant's right to a fair trial.

Given proper joinder of the offenses, and considering the evidence presented on the merits, we find there was no need for a tailored instruction on spillover. The military judge's instructions were sufficient to focus the attention of the court members on each specification and keep that evidence separate from the evidence on the others. By way of illustrating our confidence in the members' ability to avoid the prejudicial effects of spillover, we note the members found appellant guilty of only one of three offenses

involving one teenaged victim, TPL. We find this assignment of error to be without merit.

### Expert Witness Bolsters Credibility of Victims

In his next assignment of error, appellant asserts the government's expert on child sexual abuse impermissibly served as a "human lie detector" by asserting that, in her opinion, the teenaged boys who were alleged victims were speaking truthfully.

During cross-examination, defense counsel attacked the credibility of the teenaged victims. His questions inferred they made up the allegations as part of a blackmail scheme and questioned why they delayed so long in reporting alleged sexual abuse. After all the victims testified, trial counsel called Major (Dr.) Nancy Slicner, a psychologist specializing in sexual deviation with an emphasis in child sexual abuse. Trial counsel first covered other topics relevant to this case, such as patterns of disclosure of abuse and "conditioning" of child victims by adults. He then asked Dr. Slicner which group of victims is "less likely" to report child sexual abuse. She said, "Preteen and teenage boys." She testified they don't report abuse because of "shame and ... embarrassment" and "fear of being labeled homosexual." Trial counsel asked, "based on your own experience, based on whatever accepted studies have been done, how frequently do these preteen boys make false allegations of homosexual activity?" The military judge allowed the expert to answer over defense objection. Dr. Slicner replied: "I can't give you a percentage certainly, and I wouldn't want to do that. I can say, based on my own clinical experience, I have never seen it, but based on, you know, what I've read, it is extremely rare." In the context of this trial, appellant asserts, the expert's testimony amounted to an endorsement of the truth of the teenaged boys' allegations.

■ Trial practitioners using the testimony of experts in the field of child sexual abuse must walk a fine line. An expert may testify about a syndrome and whether the purported victim fits the pattern of the syndrome. *See generally United States v. Suarez,* 35 M.J. 374, 376 (C.M.A.1992). Such testimony bears on the credibility of the victim, since it corroborates that the victim fits a known pattern, but is admissible, nevertheless, because it assists the factfinder in understanding evidence. Mil.R.Evid. 702. An expert is not, however, permitted to give a direct opinion as to the truthfulness of the victim, for that amounts to an opinion as to the guilt or innocence of an accused. *Suarez; United States v. Harrison,* 31 M.J. 330 (C.M.A.1990).

■ The great majority of Dr. Slicner's testimony was unobjectionable, but the question to which appellant's counsel objected was improper. It called for more than an explanation of why victims of child sexual abuse may be reluctant to disclose abuse (*see, e.g., Suarez,* 35 M.J. at 376); it called on the expert to assess the relative truthfulness of alleged victims. Dr. Slicner's testimony that "preteen boys" rarely make false allegations of homosexual abuse and "I have never seen it," was a direct commentary on the credibility of the victims, and the military judge should have excluded it.

■ As we review all the testimony—of experts and victims—we do not find the impact of this error to have been as severe as appellant claims. Neither counsel mentioned Dr. Slicner's "credibility" testimony again during the trial. Moreover, it does not appear to have influenced the members, who acquitted appellant of two specifications relating to one of the teenaged victims. We find no prejudicial impact from Dr. Slicner's improper testimony. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (1988).

### Ineffective Assistance of Counsel

Appellant asserts he was denied the effective assistance of counsel, citing a litany of acts and omissions by Mr. [R], his civilian counsel. These allegations fall into one or more of four categories: (1) evidence of Mr. R's "unbridled, open hostility and disdain for the Air Force and its military justice system;" (2) violations of ethical standards; (3) errors or omissions in trial strategy; or (4) "deficient and inexplicably careless" post-trial representation.

■ An appellant who claims ineffectiveness of trial defense counsel must establish both ineffectiveness and prejudice. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Scott*, 24 M.J. 186 (C.M.A.1987). The Court of Military Appeals has articulated a three-part analysis for such claims: (1) the factual allegations must be true; (2) the counsel's performance must have fallen below an objective standard of reasonableness; and (3) there must be a reasonable probability that, but for the errors, the result would have been different. *United States v. Tharpe*, 38 M.J. 8, 10–11 (C.M.A.1993); *United States v. Polk*, 32 M.J. 150, 153 (C.M.A.1991).

■ We begin our analysis with the asserted errors arising out of Mr. R's alleged disdain for the military justice system. Appellant argues Mr. R's refusal to attend the first two Article 32 hearings was an obvious display of his hostility which poisoned the atmosphere between the defense and the command staff judge advocate and put appellant at a disadvantage throughout the remainder of the proceedings. However, appellant has shown no concrete example of prejudice, and we find none. We also find no prejudice to appellant arising from the remaining alleged hostile acts. Thus, whether or not appellant is correct about Mr. R's attitude, absent some concrete prejudicial impact we find no grounds for relief.

In assessing the alleged ethical violations, our concern is, again, their impact on the proceedings, not the violations themselves. Appellant fails to cite how any of the asserted ethical violations had a prejudicial impact on his trial or post-trial review, and we find none.

Of the several allegations of deficiency in pretrial preparation and trial performance, we find one worthy of discussion: that Mr. R failed to develop an adequate expert case. Specifically, appellant asserts Mr. R requested an unqualified expert consultant, failed to request a *child* forensic psychiatrist as an expert consultant or witness, and failed to interview Dr. Hunt, the child psychiatrist who interviewed AS shortly after the alleged abuse.

Mr. R requested Captain (Dr.) Thompson, a forensic psychiatrist, be appointed a defense expert consultant, and the convening authority agreed. Dr. Thompson assisted in pretrial preparation of witnesses, observed the victims' testimony at trial, and testified for the defense, mostly about the credibility of appellant. In a post-trial affidavit, Dr. Thompson said he told Mr. R he had no expertise in child sexual abuse and could not testify concerning the victims. He also said that after he learned the government planned to use an expert with extensive expertise in child forensic psychiatry, he recommended Mr. R obtain an additional defense expert. He said Mr. R made no effort to obtain the second expert, even though there were several qualified military experts in the local area.

Appellant asserts Mr. R asked for Dr. Thompson solely because he believed Dr. Thompson shared his dislike of the military, not because of Dr. Thompson's qualifications. Appellant suggests that Mr. R didn't request the necessary expert assistance because he felt constrained by his previous request for Dr. Thompson. He argues that had Mr. R obtained and used an expert in child forensic psychiatry there is a "reasonable probability" that the outcome of the trial would have been different.

Dr. Hunt was listed as a potential prosecution witness, and the notes of his interview with AS were given to Mr. R before trial. In a post-trial affidavit, Dr. Hunt stated no defense counsel spoke with him before trial. If he had been called as a witness, Dr. Hunt said he could have expressed the following concerns about AS's allegations of sexual abuse: (1) his story changed over time, to include more and more incidents and further details of abuse; (2) he did not use "child language" to describe what happened; (3) he was sleeping with his mother when the allegations first came to light, and no expert evaluated whether this 9–year old boy was overly stimulated by "such closeness"; and (4) there was a "relative absence of emotional symptoms that usually correlate" with such abuse. Mr. R, in a post-trial affidavit, stated he spoke with Dr. Hunt by telephone but elected as a tactical matter not to call him as

a witness, based on that conversation "and his position at the time."

■■■■■ For purposes of discussing this issue, we assume the truth of appellant's allegation that Mr. R did not interview Dr. Hunt and failed to learn how Dr. Hunt's testimony could have helped the defense. We believe an ordinary, fallible lawyer would have interviewed Dr. Hunt as a potential witness and in preparation for cross-examination of AS. Despite the fact that nothing in Dr. Hunt's interview notes presaged his post-trial "concerns" about AS's credibility, a counsel who interviewed Dr. Hunt would have learned of his concerns. On the other hand, we do not fault Mr. R for his choice of Dr. Thompson as an expert consultant or for his failure to request a second consultant. We note that Dr. Thompson, in a statement included in appellant's post-trial clemency package, said he only learned of the "magnitude" of the credibility issue with the child witnesses the day before trial. In addition, Mr. R demonstrated a competent understanding of the child witness credibility issue during his admirable cross-examination of the government expert witness. Thus, although we might have chosen a different course in preparation of the defense case, we cannot say Mr. R's attempts to educate himself and develop a defense through experts fell below the minimum level of competence expected of a lawyer.

■■■■■ Having found that Mr. R's failure to interview Dr. Hunt fell below an acceptable standard of advocacy, we must assess this deficiency for prejudice. Prejudice requires showing that counsel's errors were so great that there is " 'a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt[ ].' " *Tharpe*, 38 M.J. at 10–11, *quoting Polk*, 32 M.J. at 153. We apply this prejudice test by assessing the harm appellant's defense suffered by the failure to have Dr. Hunt *testify as a witness*.

■■■■■ Our assessment begins with the fact that Dr. Hunt's testimony would not have directly contradicted any evidence of guilt. When we consider Dr. Hunt's concerns about AS's story, it is relevant that similar testimony was before the members, albeit not from a person with Dr. Hunt's professional credentials. Two of his concerns—AS suffered little or no academic and emotional change during the period of abuse and the unusual sleeping arrangements with his mother— were brought out in cross-examination of AS's mother and used, to some advantage, by the defense. Dr. Hunt's concerns that AS made "major additions" to his story before trial were brought out during the testimony of the government expert. However, her explanations for the additions were contrary to those Dr. Hunt apparently would have given. In weighing the credibility of the experts, it is important to note that none of Dr. Hunt's concerns were written in his notes—a fact sure to be brought out on cross-examination had Dr. Hunt testified. Given the strength of the testimony of AS and his mother, we are convinced that, "absent the error" of failing to interview and use Dr. Hunt, the factfinder would not have had a reasonable doubt concerning guilt. *Cf. Polk*, 32 M.J. at 153.

Our final area of alleged ineffectiveness concerns appellant's post-trial clemency submissions. The package is large, occupying more than 2 inches of the record of trial. Among its contents are two statements from LB, a woman whose daughter had been in appellant's wife's home day care. Appellant asserts that one of LB's statements was so inflammatory, "laden with damaging innuendo and speculation," that its presence in the clemency package was "hurtful to the appellant's cause beyond calculation." The presence of this letter in the clemency package, appellant argues, shows "inexplicable negligence" on Mr. R's part.

■■■■■ We have carefully reviewed the entire clemency package, including the statements of LB. Her second statement was indeed adverse to appellant's petition for clemency. We agree with appellant that a "thoughtful" counsel would not have included this statement in the package, and conclude it became part of the package through neglect. However, reasonable advocacy is not necessarily free of error and mistakes. We note Mr. R diligently pursued post-trial clemency for appellant. He asked for and re-

ceived a private meeting with the convening authority to press appellant's claims of innocence. We find the inclusion of LB's second statement was an administrative oversight that did not reflect ineffective assistance of counsel.

We conclude this discussion of Mr. R's alleged ineffectiveness with an observation. Overall, Mr. R's representation of appellant was "vigorous and energetic," as even appellant concedes. He made some mistakes— one of which we found serious enough to test for prejudice—but, on the whole, he was a forceful, zealous advocate for his client in a lengthy, difficult case.

### Variance in Findings

Appellant asserts, in four separate assignments of error, that there was a fatal variance between the pleadings and proof of four specifications. Before considering each, we set forth the principles of law to be applied to the issue.

THE MANUAL FOR COURTS–MARTIAL, UNITED STATES, 1984 (MCM) provides for findings by "exceptions and substitutions" when there is a variance between the pleadings and the proof of an offense. *See* R.C.M. 918(a)(1). Where the court in making its findings does not alter the specification by exceptions and substitutions, a variance between pleadings and proof may or may not be fatal to the prosecution. The primary consideration is one of due process. *United States v. Wray,* 17 M.J. 375 (C.M.A. 1984). A variance is fatal when an accused is so misled as to be unable adequately to prepare for trial or is not fully protected against another prosecution for the same offense. *United States v. McCullah,* 8 M.J. 697 (A.F.C.M.R.1980). A variance in date is not fatal when the date established at trial is within the statute of limitations and before the charge filed, but this rule has exceptions. *United States v. Gehring,* 6 U.S.C.M.A. 657, 20 C.M.R. 373, 376 (1956); *United States v. Freeman,* 23 M.J. 531, 538 (A.C.M.R.1986). One exception is when the accused is charged with "several acts committed under substantially similar circumstances at the same place." *Gehring,* 20 C.M.R. at 376. Another is when proof of a different time alters the

nature of the offense or the maximum punishment. *Freeman,* 23 M.J. at 538.

### A. Indecent Liberties with AS

In specification 2 of the Charge, appellant was charged with taking indecent liberties with 9–year old AS "on or about November 1990" by masturbating in the boy's presence with intent to gratify his own sexual desires. Appellant asserts the proof at trial is insufficient for two reasons: no testimony shows appellant masturbated in AS's presence; and no testimony links any acts which could arguably be masturbation with the month of November 1990.

AS testified appellant was "rubbing" his penis in AS's presence on 15 February 1991. In response to a member's question, AS said he did not know what "masturbate" meant. Nevertheless, the evidence in the record convinces us beyond reasonable doubt of appellant's guilt of this offense. The date variance is not fatal, as appellant was not misled and is fully protected from further prosecution on the same facts.

### B. Indecent Liberties and Sodomy with JMK

In specification 4, Additional Charge I, appellant was charged with taking indecent liberties with JMK, then under age 16, "on divers occasions on or about the summer of 1989" by masturbating in JMK's presence and by showing him a pornographic videocassette movie with intent to gratify appellant's sexual desires. Appellant attacks the findings in four respects: (1) there is no proof of the time alleged; (2) there is no proof of "divers occasions;" (3) there is no proof the movie was "pornographic;" and, (4) there is no showing of appellant's intent to gratify his own sexual desires in showing the movie. Appellant also asserts this specification is multiplicious, in part, with specification 3 of Additional Charge I, which alleges appellant committed indecent liberties with BWV, JMK, and JMZ, males under age 16, by showing them pornographic videocassette tapes with intent to gratify his own or their sexual desires.

█ JMK's testimony as to time was confusing, to say the least. He testified he first met appellant in 1987 or 1988 and that he

moved with his parents from the neighborhood in the summer of 1989. (There was other testimony that JMK actually moved in 1990.) JMK also testified, variously, that the events happened in the summer of 1989 and fall of 1988. During initial questioning by the prosecutor and on cross-examination, JMK stated the events happened in the summer of 1989, and we believe that time is proved beyond reasonable doubt.

Appellant is correct, as the government concedes, that the evidence at trial establishes but one masturbation by appellant in the presence of JMK. We will take action to correct the finding in our decretal paragraph.

Both specification 4 and specification 3 of Additional Charge I allege appellant showed pornographic videocassettes to boys under 16. Appellant asserts there is insufficient proof that appellant showed any of the boys a videocassette that was *pornographic*. He also argues the finding of guilty of showing a videocassette to JMK in this specification is multiplicious with the finding of guilty of specification 3. We defer discussion of the pornographic nature of the videocassette in specification 4 because we agree with appellant that the two specifications are multiplicious.

■ JMK testified appellant "once or twice" showed him a pornographic movie. JMZ and BWV testified JMK was present when appellant showed them a pornographic movie. We find the evidence insufficient to conclude that JMK was shown more than one allegedly pornographic movie by appellant. We will cure the multiplicity inherent in the court members' findings by striking the language concerning a pornographic movie from specification 4.

■ In specification 3, Additional Charge II, appellant was convicted of sodomy on divers occasions with JMK "on or about the summer of 1989." Appellant asserts that the testimony of JMK concerning this offense suffers from the same infirmities of imprecise time as his testimony concerning indecent liberties, discussed above. Having examined all the evidence, we are convinced beyond reasonable doubt that appellant committed the acts alleged. Any variance between pleadings and proof is not fatal, for appellant was not misled and is fully protected against a second prosecution for these acts.

### C. Indecent Liberties with BWV, JMK, and JMZ

In specification 3, Additional Charge I, appellant was charged with taking indecent liberties with BWV, JMK and JMZ by showing them "pornographic videocassette tapes" with intent to gratify his or their sexual desires. Appellant argues the evidence is insufficient to sustain the finding of guilty because: (1) the testimony of the boys was too disparate and uncertain as to when it occurred and who was present; (2) there is no evidence whatsoever to prove the videocassette, if they saw one, was pornographic and, (3) nothing in the boys' testimony supports the inference that appellant showed a movie to any of the boys with an intent to gratify the sexual desires of himself or any of the boys.

■ On the first point, our review of the boys' testimony shows their stories have substantial congruence. There are discrepancies, but these are not so important as to cause us to doubt that the events occurred. We are convinced by the evidence that appellant showed all three boys at least one videocassette movie which all the boys believed was "pornographic" because of its sexual orientation.

The pornographic nature of the movie was not the subject of much testimony. All three boys testified the movie appellant showed was "pornographic," but evidence of the contents of the movie is sparse. JMK testified one movie had a "cops and robbers" theme; he believed it was called "Miami Spice." (No videocassette of that name was introduced into evidence.) When asked what he saw in the movie, JMK said, "[n]aked people and having sex." BWV testified the movie appellant showed had "a lot of sex," including people having intercourse. He did not know a title or remember a plot. JMZ said appellant showed them a "porno" movie, the title of which he never saw because appellant put it into the videocassette player. He said the movie showed "[p]eople having sex and

stuff." All the boys agreed appellant initiated the showing of the movie by asking them to watch.

Appellant argues the boys' testimony is wholly inadequate to prove they were shown a "pornographic" movie. In order to find appellant guilty, he argues, the members must have impermissibly considered Prosecution Exhibit 1, a videotaped movie AS testified he was shown by appellant, to infer that appellant showed the teenaged boys the same or a similar pornographic movie.

▮ We agree with appellant that the evidence doesn't establish that appellant showed the boys a "pornographic" movie, but that does not end the matter. As the Court of Military Appeals has ruled, an adult may be convicted of taking indecent liberties with a child by showing the child material not legally pornographic, if "accompanied by behavior and language . . . which demonstrated his intent to arouse his own sexual passions, those of the child, or both." *United States v. Orben*, 28 M.J. 172, 175–76 (C.M.A.1989). The testimony about the sexual content and orientation of the movie appellant showed the boys was sufficient to support a finding of guilty of indecent liberties, if the requisite intent was shown.

That brings us to the final point. Appellant argues there is no evidence of any "improper acts, solicitations, suggestions or comments by the appellant directed to any of the witnesses" and "no testimony suggesting sexual arousal by anyone involved." Thus, he asserts, no evidence supports an inference he had the intent to arouse his own or the boys' sexual desires.

▮ As appellant concedes, an intent may be inferred from circumstantial evidence. An intent may also be inferred from other charged offenses. Mil.R.Evid. 404(b). We have no trouble inferring from the appellant's other acts with the boys that his intent in showing them the videocassette movie was to gratify either his or their sexual desires.

### Conclusion

As we have discussed above, several changes in the findings are necessary. We approve specification 4, Additional Charge I, with changes as follows:

> In that STAFF SERGEANT JOHN D. MARRIE, United States Air Force, 3280th Technical Training Group, did, at Lackland Air Force Base, Texas, on or about the summer of 1989, take indecent liberties with [JMK], a male under 16 years of age, not the wife of the said Staff Sergeant Marrie, by masturbating in the presence of the said [K], with intent to gratify the sexual desires of the said Staff Sergeant Marrie.

We approve specification 3, Additional Charge I, with changes as follows:

> In that STAFF SERGEANT JOHN D. MARRIE, United States Air Force, 3280th Technical Training Group, did, at Lackland Air Force Base, Texas, on divers occasions between or about January 1989 and on or about June 1989, take indecent liberties with [BWV], [JMK], and [JMZ], males under 16 years of age, not the wives of the said Staff Sergeant Marrie, by showing the said [V], [K], and [Z], videocassette tapes which pictured naked adults engaged in sexual intercourse, with intent to gratify the sexual desires of the said Staff Sergeant Marrie, the said children, or both.

The military judge ruled that specification 3, Additional Charge I, was to be treated as one for sentencing purposes with the other specifications involving each boy named. Thus, it was considered one with specification 4, Additional Charge I, concerning JMK. It was considered one with the sodomy specifications—specification 3, Additional Charge II, concerning JMK, and specification 2, Additional Charge II, concerning BWV. It was also considered one for sentencing purposes with specification 5, Additional Charge I, concerning JMZ. Moreover, specifications 1–3 of the Charge, all concerning AS, were considered one offense for sentencing. We view this ruling by the military judge to be generous, based on the rules for sentencing found in R.C.M. 1003(c)(1)(C). We have, nevertheless, reassessed the sentence to be sure that appellant receives the benefit of our correction of the findings, and we are confident the approved sentence is no great-

er than he would have received had the findings been as we approved them. *United States v. Suzuki,* 20 M.J. 248, 249 (C.M.A. 1985). We find the approved sentence, as reassessed, correct. *United States v. Peoples,* 29 M.J. 426, 428 (C.M.A.1990); *United States v. Sales,* 22 M.J. 305 (C.M.A.1986); Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1988).

The approved findings of guilty, as modified above, and the approved sentence, as reassessed, being correct in law and fact, are hereby

AFFIRMED.

Judges PEARSON and SCHREIER concur.