# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40426**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Joshua A. PATTERSON**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 27 September 2024

————————————

*Military Judge*: Christina M. Jimenez (pretrial motion); Colin P. Eichenberger.

*Sentence*: Sentence adjudged 8 December 2022 by GCM convened at Hill Air Force Base, Utah. Sentence entered by military judge on 27 January 2023: Dishonorable discharge, confinement for 17 years, forfeiture of all pay and allowances, reduction to E-1, and a reprimand.

*For Appellant*: Major Kasey W. Hawkins, USAF; Major Frederick J. Johnson, USAF.

*For Appellee*: Lieutenant Colonel Pete Ferrell, USAF; Major Olivia B. Hoff, USAF; Major Jocelyn Q. Wright, USAF; Captain Kate E. Lee, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, GRUEN, and WARREN, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Judge GRUEN joined. Judge WARREN filed a separate opinion concurring in part and in the judgment.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

JOHNSON, Chief Judge:

A general court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of three violations of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920, including one specification of rape,[1] one specification of aggravated sexual contact,[2] and one specification of abusive sexual contact;[3] one specification of rape of a child in violation of Article 120b, UCMJ, 10 U.S.C. § 920b;[4] and one specification of assault consummated by a battery in violation of Article 128, UCMJ, 10 U.S.C. § 928.[5,6] The court-martial sentenced Appellant to a dishonorable discharge, confinement for 17 years, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings and approved the sentence in its entirety.

Appellant raises five issues on appeal, which we have re-ordered: (1) whether the convening authority impermissibly considered the race and gender of potential court members when detailing members to the court-martial; (2) whether the military judge erred in denying a defense motion to compel the appointment of an expert consultant in digital forensics; (3) whether the findings of guilty as to rape of a child (Specification 1 of Charge II) and aggravated sexual contact (Specification 2 of Charge I) are legally and factually insufficient; (4) whether trial counsel engaged in prosecutorial misconduct during sentencing argument by encouraging the members to sentence Appellant for uncharged misconduct; and (5) whether Appellant was denied a constitutional right to a unanimous verdict.[7] In addition, although not raised as an assignment of error, we consider whether Appellant is entitled to relief for unreasonable appellate delay.

We have carefully considered issue (5) and conclude it warrants neither discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A.

---

[1] *See Manual for Courts-Martial, United States* (2008 ed.).

[2] *See Manual for Courts-Martial, United States* (2019 ed.).

[3] *See Manual for Courts-Martial, United States* (2019 ed.).

[4] *See Manual for Courts-Martial, United States* (2012 ed.).

[5] Unless otherwise indicated, all references to the UCMJ, the Rules for Courts-Martial, and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[6] The court-martial found Appellant not guilty of one specification of sexual assault of a child in violation of Article 120b, UCMJ, *Manual for Courts-Martial, United States* (2016 ed.).

[7] Appellant personally raises issue (5) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

1987); *see also United States v. Anderson*, 83 M.J. 291, 302 (C.A.A.F. 2023) (holding an accused servicemember does not have a constitutional right to a unanimous court-martial verdict), *cert. denied*, 114 S. Ct. 1003 (2024).

As to the remaining issues, we find neither issues (1) nor (2) warrant relief, and we find Appellant's conviction for aggravated sexual contact legally and factually sufficient. However, we find Appellant's conviction for rape of a child is factually insufficient; accordingly, we set aside the finding of guilty as to Specification 1 of Charge II and the sentence. Because we further find remand for a new sentencing proceeding is appropriate in light of the changed findings, we do not address issue (4).

# I. BACKGROUND

The court-martial convicted Appellant of offenses against three victims: his former wife, AD; his former stepdaughter by a second marriage, CH; and CH's friend, SE.

## A. AD

In the spring of 2008, while Appellant was stationed at Nellis Air Force Base (AFB), Nevada, he met and began dating AD. AD was also an active duty servicemember at the time.[8] They married in July 2008. According to AD, their relationship began to deteriorate after AD became pregnant in September 2009. AD gave birth to a son in May 2010.

AD testified that in July 2010, approximately six weeks after AD gave birth, she and Appellant attended a party at the home of one of Appellant's co-workers, JD. AD and Appellant both consumed alcohol at the party and became intoxicated. AD and Appellant spent the night in JD's house on an air mattress in a downstairs room. During the night, Appellant wanted to engage in sexual intercourse with AD, which they had not done since before AD had given birth. A doctor had told the couple they were "allowed" to have sex beginning six weeks after the birth, but AD felt she "wasn't ready, physically, mentally, [or] emotionally." AD told Appellant she was not ready and that she did not want to have sex. However, Appellant got on top of her and penetrated her vagina with his penis. AD physically resisted Appellant by trying to push him off her and by trying to roll off the mattress, but Appellant held her arms and her head so that she could not move, and AD stopped resisting.

AD did not report this incident at the time. She testified that she did not want to remain with Appellant, but she tried to "be a good wife and be a good mother" for the sake of their son. AD testified that after the July 2010 incident,

---

[8] AD had separated from the military by the time of Appellant's trial in December 2022.

she would repeatedly awaken at night to find Appellant "either trying to penetrate [her] [with his penis] or actually having sex with [her]." AD testified that "[m]ost of the time" when this happened, when she awoke Appellant had already "insert[ed] his penis into [her] vagina." AD could not estimate how many times this occurred, other than that it happened "a lot." This behavior continued until Appellant departed for a one-year remote assignment overseas in mid-2011. AD filed for divorce while Appellant was overseas, and the divorce was finalized in 2012.

AD testified she maintained a "civil" relationship with Appellant after the divorce until 2019, when AD's new husband adopted her son. Appellant stopped contacting AD's son in December 2019. AD did not report the July 2010 rape until she was contacted by investigators in 2020, after CH and SE reported the offenses described below.

**B. CH and SE**

In mid-2012, around the time that Appellant was divorced from AD, he transferred to Shaw AFB, South Carolina. There he met RP, a single civilian woman with two daughters, one of whom was CH.[9] Appellant and RP began a relationship and eventually married. Appellant, RP, and CH moved into a house near Shaw AFB with a detached garage. In January 2015, RP became pregnant.

At trial, CH described a night in "roughly spring/summer of 2015," when CH was 12 years old, when she and Appellant were in the garage working together on a "go kart." Appellant was drinking alcohol and offered CH "a couple of drinks," which she accepted. After CH drank the alcohol, she started to feel hot and dizzy and her head was "spinning." She lay down on a futon in the garage and closed her eyes. Appellant turned off the light and "slowly [got] on top of [CH]." CH kept her eyes closed and pretended to be asleep as she felt Appellant remove her shorts and put his fingers inside her vagina. Then CH heard her mother RP walking toward the garage, and felt a blanket thrown over her. RP knocked on the door. Appellant "got up really fast and opened the door." RP asked Appellant what was going on, and Appellant said CH had lay down because she was not feeling well. RP suggested they wake CH up and take her inside, but Appellant said he would carry CH. CH "remember[ed] [Appellant] carrying [her] inside the house with the blanket still wrapped around [her], so [her] mother couldn't see that [CH] was unclothed from the waist down."

---

[9] RP's other daughter, CH's sister, lived primarily with her father and played no significant role in any events recounted at Appellant's court-martial.

CH could not recall when exactly this incident occurred. When asked how she knew it happened in 2015, CH explained it was after RP had become pregnant in January 2015 but before her brother T was born in late September 2015, and she again described it as "during spring [or] early summer." She further remembered the weather was not cold and "was good for T-shirts and basketball shorts and anything." At a later point in her testimony, CH described her mother as "probably five [or] six months" pregnant at the time.

CH did not report this incident to her mother. However, after it occurred, CH began spending more time with friends and neighbors, away from her home.

CH testified that in the years following this incident, on multiple occasions she awoke in her bed and found Appellant lying next to her and touching her inappropriately. On some occasions, Appellant would have his hand under her shirt, or wrapped around her torso holding her breast. On other occasions, Appellant would be touching her "vaginal area" over her clothing. On some of these occasions Appellant would be asleep; on other occasions he would be awake and actively touching her. CH testified these incidents started in South Carolina, where she estimated they occurred "once or twice a month," but they became more frequent in late 2018 after the family moved to Hill AFB, Utah, where it occurred approximately weekly. CH testified she responded to these incidents in various ways such as by shifting her body, leaving her bed to sleep elsewhere, or—as she got older—dragging Appellant out of the bed. CH also testified that on multiple occasions Appellant slapped her on her buttocks and said her "butt" looked "nice." CH did not directly confront Appellant regarding these incidents, nor did she tell her mother about them.

In Utah, CH became close friends with another girl, SE. CH, SE, Appellant, RP, CH's young brother T, JR (an adult friend), and JR's boyfriend went on a camping trip together in July 2019. At trial, CH, SE, and JR testified about this trip. On the second day of the trip RP became intoxicated and increasingly belligerent, getting into arguments with multiple people. As a result, that night JR and her boyfriend drove RP and T back to their home on Hill AFB while Appellant, CH, and SE remained at the campsite. CH and SE went to sleep in the tent they shared. SE testified Appellant later entered the tent and "stuck his hand down [SE's] pants," touching "the top part of [her] vagina." SE grabbed Appellant's arm and tried to pull it away, but Appellant locked his arm in place so she could not move it and continued to touch her for approximately ten minutes. SE then woke up CH and showed CH that Appellant had his hand in SE's pants. CH testified she then said "hey" and pushed Appellant's arm; in response, Appellant "jumped up really fast and acted like he didn't know what was going on, and immediately laid back down to sleep." CH and SE "didn't really talk about [the incident] much after," and neither of them

further confronted Appellant about it or reported it to RP or anyone else at the time.

In October 2019, Appellant got into an argument with CH at their on-base house regarding her phone. CH testified Appellant "got mad and ran up really fast and he grabbed [CH] by the back of [her] hair and threw [her] off of the couch onto the floor." CH then ran out of the house, pursued by Appellant who grabbed her by the back of the neck. CH yelled, which caused several people nearby to look at them, and Appellant let go of CH. CH then ran away from Appellant, departed the base, and soon thereafter traveled back to South Carolina to live with a former neighbor, KB.

Shortly after CH arrived in South Carolina, she received a text message from Appellant asking if she was planning to go back to school. CH responded with a lengthy text message expressing how she felt mistreated by Appellant and her mother, RP, including the following:

> And if you do call me in as a run away and y'all don't send me my papers for school I will go to court and I will explain everything because I will not go back into that house . . . . You put your hands on me josh you have hurt me physically and I never thought you would do that and don't even let me bring up how [you] hurt me the other time (multiple times). . . .

In response, Appellant wrote: "Hey we just want you to be happy so we will help you out. Love you." CH further testified that at a later point in time Appellant called her late at night and "apologiz[ed] for the things that he[ had] done and [said] that if [CH] came back, [she] would never have to worry about anything like that again." KB evidently overheard part of this conversation and testified she heard Appellant say, "[CH], if you come back, I'll give you whatever you want, I will stay out of your bed and I will quit touching you."

In January 2020, CH agreed to return to Utah and resumed living with Appellant and RP. CH resumed her friendship with SE, who "basically lived" with CH in Appellant's house. CH testified Appellant did not touch her inappropriately after she returned to Utah.

SE testified that one night in March 2020, Appellant, RP, and SE were drinking alcohol in Appellant's garage. RP went into the house to go to bed, but Appellant and SE continued drinking in the garage. Appellant began to "flirt" with SE and offered her $100.00 for a "lap dance." SE surreptitiously began recording audio of the incident using the videorecording feature on her phone.[10]

---

[10] Although these were video recordings, the phone's camera was not directed toward either CH or Appellant, and in effect the recordings capture only audio of the incidents.

Appellant continued to ask SE for a "lap dance" and for "sex" and said "he was willing to pay [her]," despite SE telling him no. Appellant then reached over to SE, who had her legs crossed, and touched her "vaginal area" over her clothes. Appellant then asked to see SE's breasts. When SE did not comply, Appellant "proceeded to lift up [her] shirt and put his mouth on [her] breast area." SE did not consent to this and felt "[v]ery, very, very violated and disrespected." Appellant later went to get another beer, and SE went inside the house. SE informed CH about the recording, but did not otherwise report the incident at that time. At trial, the Government introduced a copy of the audio recording SE made of the incident.

Several weeks later, Appellant and RP agreed to let CH move in with her then-boyfriend MR. As CH and MR were moving CH's belongings out of Appellant's house, RP repeatedly asked CH and MR why CH was moving out. Eventually, as they were leaving, MR made a comment to the effect that Appellant "was not the man [RP] believed he was." Later RP called CH and asked her to explain MR's comment, and CH admitted Appellant had touched her inappropriately. This, in turn, led RP to angrily confront Appellant in a conversation CH, SE, and MR partially overheard through RP's phone. Shortly thereafter, Appellant called CH in a conversation which MR overheard. According to MR, Appellant "said that he was sorry and that he knows that he was wrong and that he was going to wait there [at his house] until they got there, because he wasn't going to run from it." RP called law enforcement the same day.[11]

At trial, Appellant was convicted of the following offenses: rape against his former spouse, AD, by penetrating her vulva with his penis by force in July 2010 (Article 120, UCMJ);[12] rape of a child against CH "between on or about 1 October 2015 and on or about 30 November 2015" by penetrating her vulva with his finger using force (Article 120b, UCMJ);[13] aggravated sexual contact against CH's friend, SE, in July 2019 by touching her vulva with his hand using unlawful force (Article 120, UCMJ); assault consummated by battery against CH in October 2019 by unlawfully grabbing her hair with his hand (Article 128, UCMJ); and abusive sexual contact against SE in March 2020 by touching her breast with his mouth without consent (Article 120, UCMJ).

---

[11] RP made an initial report and statement to security forces, but eventually decided not to participate in Appellant's court-martial and was not called as a witness by either party.

[12] *Manual for Courts-Martial, United States* (2008 ed.).

[13] *Manual for Courts-Martial, United States* (2012 ed.).

## II. DISCUSSION

### A. Court Member Selection

#### 1. Additional Background

Between 27 April 2021 and 1 December 2022, three convening authorities issued a total of six special orders appointing members to Appellant's court-martial. Included with the record of trial are the lists of potential court-martial members provided to the convening authority for consideration and selection. These documents include each individual's name, rank, unit of assignment, duty title, whether the individual has prior experience serving on a court-martial or administrative board, and in the case of officers, whether they have experience as commanders. Neither the gender nor race of the individuals was expressly indicated on these documents. The convening authority indicated the members he or she selected to serve on the court-martial by writing his or her initials next to the individual's name.

Of note, with regard to the fifth of the six appointments of court-martial members, the convening authority was presented with a list of nine proposed replacement enlisted members. Two of the members had names that suggested they were female; six of them had names suggesting they were male; and one had only the first two initials with the surname.[14] On this occasion the convening authority selected both of the "female" names and two of the "male" names.

The Defense did not object to the convening authority's court member selection process prior to his appeal before this court.

On appeal, Appellant moved to attach "data sheets" and Single Unit Retrieval Format summaries (SURFs) of personal data regarding the prospective court members which had been provided to the convening authority as part of selection process. These documents contained considerably more personal and career information about each individual, including an indication of their gender and race. The Government objected to the attachment of these documents on the grounds that these documents were outside the "entire record" this court may consider in our review pursuant to Article 66, UCMJ, 10 U.S.C. § 866, and not "necessary to resolve an issue raised by the record," citing *United States v. Jessie*, 79 M.J. 437 (C.A.A.F. 2020). This court granted the motion to attach, but advised it would defer its consideration of the applicability of *Jessie* until it conducts its Article 66, UCMJ, review.

---

[14] The record before us indicates this ninth individual was, in fact, male.

**2. Law**

Court-martial composition issues not raised at trial are forfeited and re-viewed on appeal for plain error. *United States v. King*, 83 M.J. 115, 120–21 (C.A.A.F. 2023), *cert. denied*, 144 S. Ct. 190 (2023). Under the plain error stand-ard of review, the "[a]ppellant bears the burden of establishing: (1) there is error; (2) the error is clear or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Robinson*, 77 M.J. 294, 299 (C.A.A.F. 2018) (citation omitted). In undertaking a plain error analysis, we "consider whether the error is obvious at the time of appeal, not whether it was obvious at the time of the court-martial." *United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F. 2008).

"When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." 10 U.S.C. § 825(e)(2).

In *United States v. Crawford*, the United States Court of Military Appeals held the intentional selection of African American servicemembers to serve on courts-martial in order to ensure fair representation of the community was consistent with constitutional guarantees of equal protection. 35 C.M.R. 3, 13 (C.M.A. 1964); *see also United States v. Smith*, 27 M.J. 242, 249 (C.M.A. 1988) ("[A] commander is free to require representativeness in his court-martial pan-els and to insist that no important segment of the military community -- such as blacks, Hispanics, or women -- be excluded from service on court-martial panels.").

In *Batson v. Kentucky*, the United States Supreme Court held a criminal defendant "ha[s] the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria," and in particular "the Equal Protec-tion Clause[15] forbids the prosecutor to challenge potential jurors solely on ac-count of their race" through the exercise of peremptory challenges. 476 U.S. 79, 85–86, 89 (1986). Following up on *Batson*, in *J.E.B. v. Ala. ex rel. T.B.*, the Court held that "gender, like race, is an unconstitutional proxy for juror com-petence and impartiality." 511 U.S. 127, 129 (1994).

In *United States v. Jeter*, the United States Court of Appeals for the Armed Forces (CAAF) overruled *Crawford* in light of *Batson*, holding "[i]t is impermis-sible to exclude or intentionally include prospective members based on their race." 84 M.J. 68, 73 (C.A.A.F. 2023). The CAAF explained, "whenever an ac-cused makes a prima facie showing that race played a role in the panel selec-tion process at his court-martial, a presumption will arise that the panel was

---

[15] U.S. CONST. amend. XIV.

not properly constituted," which the Government may then attempt to rebut. *Id.* at 70. In *Jeter*, "trial defense counsel challenged the makeup of the panel, citing a 'systematic exclusion of members based on race and gender.' The military judge noted that '[i]t appears that [the panel] is all white men.'" *Id.* at 71 (alterations in original). On appeal, the CAAF found the appellant had made a "prima facie showing that gives rise to a presumption that race was allowed to enter the selection process." *Id.* at 74. In support of this conclusion, the CAAF cited "racial identifiers" that were included in court member questionnaires provided to the convening authority, as well as "other evidence before the [C]ourt of [C[riminal [A]ppeals [(CCA)]," and "the command's understandable belief that the *Crawford* case . . . was still good law." *Id.* Among this other evidence before the CCA were that "two African American members on the original convening order were subsequently removed pursuant to the first amendment to the convening order; and three other courts-martial with African American accuseds were convened by this convening authority before all-white panel members." *Id.* In addition, the NMCCA had obtained declarations from the convening authorities and staff judge advocate, but "for all intents and purposes those affidavits simply reflected that they could not recall how the venire panel was chosen." *Id.* Under these circumstances, the CAAF found an "unrebutted inference that Appellant's constitutional right to equal protection under the law was violated when the acting convening authority presumptively used a race-conscious selection process for panel members." *Id.*

### 3. Analysis

Relying on *Jeter*, Appellant contends his court-martial panel was improperly constituted because the convening authorities inappropriately considered race and gender in selecting members. Appellant cites the fact that, as in *Jeter*, racial and gender identifiers for prospective court members were provided to the convening authorities. He also notes *Jeter* had not yet been decided, and at the time applicable precedent did not prohibit the consideration of race or gender in order to ensure a court-martial panel that was representative of the military community. Appellant additionally cites the fifth selection of court members described above, when the convening authority selected both female members and two male members for service out of a list of two females and seven males; Appellant contends such a result was "highly unlikely" unless the convening authority considered gender. Appellant argues these circumstances establish a prima facie showing the court members were improperly selected, raising an unrebutted presumption of impropriety.

In response, the Government first contends Appellant's argument cannot succeed because it relies on the court member data sheets and SURFs attached on appeal which were not part of the "entire record" originally docketed with the court, and are not necessary to resolve an issue raised by the record but

"not fully resolvable by the materials in the record." *Jessie*, 79 M.J. at 442 (citations omitted). In addition, the Government contends the "mere presence" of racial and gender identifiers in material provided to the convening authority is insufficient to make a prima facie showing that race or gender improperly influenced the member appointment process. The Government additionally notes *Jeter* did "not extend to claims of gender discrimination in member selection;" however, assuming *arguendo* the same prohibition applies to gender as to race, the Government denies the selection of two females and two males from a list of two females and seven males establishes a prima facie claim of gender discrimination.

Because Appellant did not object to the convening authority's selection of court members at trial, we review for plain error. *See King*, 83 M.J. at 120–21. For the reasons stated below, we conclude Appellant has failed to demonstrate plain error.

As an initial matter, although the Government is correct that *Jeter* specifically addressed racial discrimination, we assume for purposes of our analysis the same rationale applies to the selection or exclusion of members based on gender. *J.E.B.* essentially put gender on the same constitutional footing as race in this respect, and the Government does not substantially contest the point.

Next, we will assume for purposes of our analysis *Jessie* does not bar our consideration of the member data sheets and SURFs Appellant moved to attach on appeal. The names of the members the convening authorities did and did not select *are* included in the record, and these names are some indication of the proportions of males and females selected. In particular, the fifth member selection—where the convening authority selected both "female" names on the list but only two of the remaining seven names—may be sufficient to raise, but not resolve, an issue as to whether the convening authority improperly considered at least gender in appointing court members. Accordingly, *Jessie* would permit us to consider the data sheets and SURFs in order to resolve this issue. 79 M.J. at 442 (citations omitted).

Nevertheless, we are not persuaded Appellant has met his burden to demonstrate "clear" or "obvious" error in the selection process. We agree with the Government that the routine provision to the convening authority of professional and personal information including race and gender does not in itself constitute a prima facie showing the convening authority in fact improperly relied on such criteria in selecting members under the plain error standard of review. "[R]acial identifiers are neutral, [although] capable of being used for proper as well as improper reasons." *Jeter*, 84 M.J. at 74 (citing *United States v. Loving*, 41 M.J. 213, 285 (C.A.A.F. 1994)). "We will not presume improper motives from inclusion of racial and gender identifiers on lists of nominees for

court-martial duty." *Loving*, 41 M.J. at 285.[16] Similarly, we are not persuaded the selection on one occasion of two females and two males from a pool of two female and seven male prospective members meets the "clear" or "obvious" standard where (1) an innocent explanation is facially plausible, and (2) Appellant has not identified a similar pattern of possible discrimination in any of the other five member selections in this court-martial, nor in any other court-martial involving these convening authorities.

The circumstances in *Jeter* are distinguishable in several significant ways. First, and importantly, the appellant in *Jeter* did not forfeit the issue but challenged the selection process at trial, alleging "systematic exclusion of members based on race and gender." 84 M.J. at 71. Moreover, the record in *Jeter* indicated the panel was composed entirely of "white men." *Id*. Two African American members on the original convening order were subsequently removed from the panel by the convening authority. *Id*. at 74. Furthermore, "three other courts-martial with African American accuseds were convened by this convening authority before all-white panel members." *Id*. The CAAF concluded these circumstances, coupled with the provision of racially identifying information to the convening authority, were sufficient for a prima facie showing under ordinary standards of review. In the instant case, we do not have equivalent circumstances, and Appellant's burden to demonstrate "clear" or "obvious" error is higher. We conclude Appellant is not entitled to relief on this issue.

## B. Denial of Expert Consultant

### 1. Additional Background

As described in the Background *supra*, Appellant's stepdaughter's friend, SE, made a recording on her phone of her interactions with Appellant that preceded the abusive sexual contact in Appellant's garage in March 2020. When SE was interviewed by Special Agent (SA) H of the Air Force Office of Special Investigations (OSI) in May 2020, she played this recorded video from her phone. Afterwards, at SA H's request, SE delivered two files from this recording to SA H's duty phone which were 01:07 (file 1) and 04:18 (file 2) minutes in length. These recordings were subsequently provided to the Defense in discovery.

After certain delays, Appellant's court-martial was scheduled to begin in late August 2022. After rewatching SE's recorded OSI interview, trial defense counsel noticed the recordings SE played for OSI during the interview appeared to be longer than the recordings the Defense had received in discovery. On 19 August 2022, the Defense asked the Government to confirm the files

---

[16] We note *Jeter* did not purport to overrule *Loving*, which *Jeter* cited with evident approval.

provided in discovery were the only such files the Government possessed. The Government confirmed this was so, but agreed to ask SE if longer versions of the files existed. SE then provided the Government with a 02:40 length file (file 3), which is essentially a longer version of file 1, and a 08:31 length file (file 4), which is a longer version of file 2. On 22 August 2022, the same day Appellant's court-martial resumed, the Government provided files 3 and 4 to the Defense and indicated to trial defense counsel and the military judge it intended to introduce these newly obtained longer versions at trial. On 23 August 2022, trial defense counsel requested the convening authority appoint an expert in digital forensics examination, Mr. R, to assist the Defense in light of the production of these multiple versions of SE's video recording; the convening authority promptly denied the request. The military judge subsequently granted a defense motion for a continuance until early December 2022.

On 29 August 2022, the Defense moved the military judge to compel the Government to appoint Mr. R as a defense expert consultant digital forensic examiner (DFE). The Defense contended Mr. R's assistance was necessary to examine files 1, 2, 3, and 4. Attached to the motion was a memorandum from Mr. R, who explained that although he had not yet reviewed the files, his "review [of] each file's internal metadata . . . could reveal," *inter alia*, "[t]he make and model of the device that created each file;" "[w]hen each file was created;" "[w]hen each file was modified;" "[a]pplications, tools, and processes used to modify the files;" "[t]echnical information and settings in use by the application(s) when the files were created and/or modified;" and "[t]he physical location of the phone at the time the files were created." The defense motion asserted the Government intended to use these files and that they were relevant to the charged offense, and to the credibility of SE and CH; however, the motion is not entirely clear as to how this analysis would definitively benefit the Defense at trial. The Defense asserted Mr. R's analysis would "provide new data points for [the] Defense to reevaluate [Appellant's] plea to Charge I, Specification 3 [(abusive sexual contact of SE)], any potential defenses to the same, and areas of cross examination for the Government's witnesses." The motion concluded:

> Defense anticipates that a DFE, if appointed, will certainly testify to what is already known – that [SE] recorded [Appellant], modified those recordings, and showed up to OSI with four different files. DFE testimony is necessary because Defense cannot depend on [SE] to provide those facts. In addition, the Government cannot stipulate to those facts because, at least as far as has been disclosed to Defense, the Government does not know how or why [SE] showed up to OSI with four different recordings. A DFE is necessary to provide those objective facts to the panel, as well as to testify to anything else he finds after

> examining the files, and to aid the Defense in audio/visual aids
> to explain any concepts associated with his examination to help
> the panel better understand the evidence.

In response, the Government contended the Defense failed to demonstrate the expert assistance was necessary or that denying the motion would result in a fundamentally unfair trial. The Government argued the Defense would have the opportunity to cross-examine SE (and CH) and question OSI, and such expertise was not necessary to challenge SE's credibility on the grounds that she provided cropped recordings to OSI. The Government asserted it intended to lay the foundation for these files through SE herself and did not intend to present expert testimony. It further contended, "It is not evident from review of the digital files that any manipulation other than shortening has occurred. . . . Clipping videos to shorten them is a commonly known and widely used editing feature . . . . An expert is not required."

The military judge denied the motion in a written ruling on 22 September 2022. He explained, in part:

> The Defense's primary argument to compel expert consultant assistance is that such assistance is necessary to explore potential manipulation of the video files, beyond merely shortening the initial versions transferred. Despite putting forward that theory, the Defense has failed to sufficiently demonstrate why or how they believe a more significant file manipulation occurred and failed to sufficiently demonstrate a probability that the expert assistance requested would be able to discover manipulation. . . . Simply because multiple similar media files exist does not, per se, require expert evaluation and assistance. The facts before the [c]ourt on this motion raise, at best, only a "mere possibility" that an expert could be of assistance to the Defense in this case, but not a "reasonable probability" that the requested expert would be able to assist the Defense.
>
> [ ] Exploring the possibility that certain pieces of evidence could have been altered by a victim is a line of inquiry and general theory of defense that falls within the realm of matters competent counsel can and should be equipped to handle on their own through effective pretrial investigation and examination of witnesses. . . .

The military judge further found the Defense failed to demonstrate denial would result in a fundamentally unfair trial, explaining expert digital forensic testimony or analysis was not a linchpin for the Government or Defense, and

that trial defense counsel were "well equipped" by the available witnesses and evidence to impeach SE on the theory that she may have manipulated the files.

### 2. Law

"A military judge's ruling on a request for expert assistance is reviewed for an abuse of discretion." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citing *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005)). "An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law." *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citation omitted). "The trial court abuses its discretion if its ruling is 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. Hennis*, 79 M.J. 370, 383 (C.A.A.F. 2020) (quoting *Lloyd*, 69 M.J. at 99).

An accused is entitled to expert assistance when necessary for an adequate defense. *Freeman*, 65 M.J. at 458. The mere possibility of assistance is not a sufficient basis; "[i]nstead, the accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial." *Id.* (citation omitted). "To establish the first prong, the accused 'must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop.'" *Id.* (quoting *Bresnahan*, 62 M.J. at 143). "Defense counsel are expected to educate themselves to attain competence in defending an issue presented in a particular case." *United States v. Kelly*, 39 M.J. 235, 238 (C.M.A. 1994). "A trial is fundamentally unfair where the government's conduct is 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Anderson*, 68 M.J. 378, 383 (C.A.A.F. 2010) (quoting *United States v. Russell*, 411 U.S. 423, 431–32 (1973)).

### 3. Analysis

Appellant contends the military judge abused his discretion by denying the Defense's motion to compel the appointment of a DFE. We disagree.

The military judge reasonably concluded the Defense failed to meet its burden to demonstrate why expert assistance was required and what it would have accomplished for Appellant. The record establishes that SE possessed separate recordings of portions of a conversation between herself and Appellant which began and ended at different points in time. File 3 begins approximately 30 seconds before file 1 and ends approximately 01:03 later than file 1; file 4 begins at the same point as file 2, but ends approximately 04:13 later than file 2. Whatever significance there was to the fact that SE had multiple

copies of the recording of different lengths, and provided the shorter version to OSI after playing the longer version in the interview, this information was already known to trial defense counsel for investigation, cross-examination, and impeachment at trial. However, the Defense failed to identify any indication that SE had otherwise "manipulated" the recording such that digital forensic analysis would provide further impeachment material or undermine the admissibility of the recording. Trial defense counsel might hope that additional useful information could be found, but such a result was speculation. Moreover, we find denial of the motion did not subject Appellant to a fundamentally unfair trial. Trial counsel became aware of the longer versions of the recordings at approximately the same time as the Defense, and the Government did not present expert testimony and evidently did not rely on digital forensic expertise in order to analyze or present the recordings. Thus, the parties were similarly situated with regard to this evidence, and the Defense obtained a continuance of over three months in order to contend with it.[17]

On appeal, Appellant argues the military judge "significantly oversimplified the basis for the Defense's motion." Appellant contends the totality of the circumstances—that "[l]onger videos which were more inculpatory than the originals emerged years after a complaining witness provided the original files to AFOSI"—"gives rise to a reasonable probability that the videos were manipulated, and the Defense needed expert assistance to analyze the files and determine the nature and extent of manipulation." We are not persuaded of any reasonable probability SE "manipulated" the evidence. The information presented to the military judge indicated SE possessed different recordings of different lengths of the same interaction with Appellant. She played the longer versions during her OSI interview, and then provided the shorter versions to OSI. So far as the record indicates, she did not reapproach OSI or trial counsel with new, "manipulated" versions of the recordings. Instead, at the Defense's request, the Government asked SE if longer versions of the files existed and she provided them. We discern no reasonable implication SE "manipulated" the recordings beyond creating shortened versions of the files, which was well-known to trial defense counsel at the time of Appellant's trial.

Accordingly, we find no abuse of discretion.

---

[17] Because Appellant has not met his burden to demonstrate why expert assistance was needed or that its denial resulted in a fundamentally unfair trial, we decline to address the military judge's conclusion the Defense failed to demonstrate trial defense counsel would not have been able to develop the evidence themselves. *See Freeman*, 65 M.J. at 458.

## C. Legal and Factual Sufficiency

### 1. Aggravated Sexual Contact (Specification 2 of Charge I)

#### a. Additional Background

During direct examination, SE described Appellant's aggravated sexual contact during the July 2019 camping trip. SE testified Appellant "stuck his hand down [her] pants," and "touched the top part of [her] vagina." Trial counsel asked, "so somewhere around your vagina, he touched you?" SE responded, "Yeah." SE testified she "grabbed his arm" and unsuccessfully tried to pull it away, which she estimated went on for approximately ten minutes. Then SE woke up CH, and CH "helped" SE remove Appellant's hand.

On cross-examination, civilian trial defense counsel asked SE, "[I]sn't it true that [Appellant] wasn't actually able to touch your vaginal area because you stopped him?" SE replied, "That is true."

Trial counsel readdressed this point on redirect examination:

> Q. The last little area that I want to talk about here is for the campout, what actually happened there with the touching. On direct when I was asking you, you had said that [Appellant] had touched you on the top of the vaginal area.
>
> A. Yes, sir.
>
> Q. But then defense counsel just asked, hey, he didn't actually make it to your vaginal area; you stopped him. Can you clarify, where did he actually touch?
>
> A. It was the top of my vaginal area. I just didn't know, like, how deep of the question he was trying to get me to answer. So he didn't, like, go in it or anything like that, just touched the top of it.
>
> Q. And that's what I want to clarify. He didn't actually penetrate you, right?
>
> A. No. No.
>
> Q. And so when you say that you stopped him, are you referring to when you were holding on to his hand?
>
> A. Yes.
>
> Q. And so he didn't actually penetrate, but he did touch that vaginal area?
>
> A. Yes. No, he did not penetrate.

### b. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Robinson*, 77 M.J. at 297–98 (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

In order to convict Appellant of aggravated sexual contact as alleged in Specification 2 of Charge I, the Government was required to prove that on or about 20 July 2019, at or near Tooele, Utah, Appellant touched SE's vulva with his hand to gratify his sexual desire by using unlawful force. *See* 10 U.S.C. § 920(c); *Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 60.b.(2)(b)(3). "Sexual contact" includes "touching . . . either directly or through the clothing, the vulva . . . of any person . . . with an intent to . . . gratify the sexual desire of any person." 10 U.S.C. § 920(g)(2). The military judge instructed the court members, without objection, that "[t]he 'vulva' is the external genital organs of the female, including the entrance of the vagina and the labia majora and labia minora." The term "force" includes, *inter alia*, "the use of such physical strength or violence as is sufficient to overcome, restrain,

18

or injure a person." 10 U.S.C. § 920(g)(4). "The term 'unlawful force' means an act of force done without legal justification or excuse." 10 U.S.C. § 920(g)(5).

### c. Analysis

Appellant contends his conviction for aggravated sexual contact against SE (Specification 2 of Charge I) is legally and factually insufficient because she testified on cross-examination that Appellant did not "touch [her] vaginal area" because she stopped him. Appellant argues trial counsel's attempt to remedy this deficiency on redirect failed because SE "only muddied the waters further by contradicting herself and using unclear terminology when she said [Appellant] touched the 'top of [her] vaginal area.'" (Second alteration in original). Appellant further notes CH testified she saw Appellant's hand in SE's pants, but did not further describe what part of SE's body Appellant was touching.

We find a rational trier of fact could have found the elements of Specification 2 of Charge I proven beyond a reasonable doubt. Despite discrepancies in certain details, the combined testimony of SE, CH, and JR established the incident occurred in July 2019 at or near Tooele, Utah. SE testified Appellant reached into her pants to touch her vaginal area and used force to keep his hand there despite SE struggling for several minutes to remove it. Her testimony was significantly corroborated by CH, who saw Appellant's hand in SE's pants and who intervened to help remove it. Moreover, rational factfinders could also consider Appellant's behavior was similar to the numerous instances CH testified to when Appellant would climb into her bed and place his hand on her breast or her groin while she slept, which was admitted pursuant to Mil. R. Evid. 413 and 414 as propensity evidence. Furthermore, under the circumstances a rational trier of fact could reasonably conclude Appellant was motivated by his sexual desires.

Specifically with respect to whether the Government proved Appellant actually touched SE's vulva, SE did agree with a leading question by civilian trial defense counsel that Appellant "wasn't actually able to touch [her] vaginal area." However, on redirect examination SE clarified what she meant by this response: Appellant *did* touch the "top part of [her] vagina," but he did not *penetrate* her vagina. A rational trier of fact could reasonably conclude SE meant Appellant touched the external portion of her "vaginal area" (*i.e.*, her vulva), either directly or through the clothing. Such an interpretation is even more plausible considering Appellant used force to keep his hand in that area for several minutes as SE struggled to remove it.

Accordingly, we find Appellant's conviction of Specification 2 of Charge I legally sufficient. Moreover, having weighed the evidence in the record of trial, and having made allowances that we did not personally observe the witnesses,

we are ourselves convinced of Appellant's guilt of Specification 2 of Charge I beyond a reasonable doubt.

### 2. Rape of a Child (Specification 1 of Charge II)

#### a. Law

The standards for legal and factual sufficiency of the evidence are stated in section II.C.1.*b*, *supra*.

In order to convict Appellant of rape of a child in violation of Article 120b, UCMJ, the Government was required to prove Appellant "commit[ted] a sexual act upon a child who has attained the age of 12 years by[ ] using force against any person." 10 U.S.C. § 920b(a)(2) (*Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*)); 2012 *MCM*, pt. IV, ¶ 45b.a.(a)(2). "Sexual act" included, *inter alia*, "penetration, however slight, of the vulva . . . of another by any part of the body . . . with an intent . . . to arouse or gratify the sexual desire of any person." 10 U.S.C. § 920(g)(1)(B) (2012 *MCM*); *see* 10 U.S.C. § 920b(h)(1) (2012 *MCM*) (adopting the definition of "sexual act" from Article 120(g), UCMJ). The term "force" includes, *inter alia*, "the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a child." 10 U.S.C. § 920b(h)(2) (2012 *MCM*). Specification 1 of Charge II alleged:

> Did, within the state of South Carolina, *between on or about 1 October 2015 and on or about 30 November 2015*, commit a sexual act upon [CH], a child who had attained the age of 12 years but had not attained the age of 16 years, by penetrating the vulva of [CH] with his finger, by using force against [CH], with an intent to gratify the sexual desire of [Appellant].

(Emphasis added). *See* 10 U.S.C. § 920b(a)(2) (2012 *MCM*); 2012 *MCM*, pt. IV, ¶ 45b.a.(a)(2).

"The military is a notice pleading jurisdiction." *United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F. 2011) (citation omitted). "[U]nless the date is an essential element of the offense, an exact date need not be alleged." *United States v. Williams*, 40 M.J. 379, 382 (C.M.A. 1994) (citing *Ledbetter v. United States*, 170 U.S. 606, 612 (1898)) (additional citations omitted). The CAAF "has consistently taken the position that '[t]he words "on or about" in pleadings mean that "the [G]overnment is not required to prove the exact date [of an offense], if a date reasonably near is established."'" *United States v. Simmons*, 82 M.J. 134, 139 (C.A.A.F. 2022) (alterations in original) (emphasis omitted) (quoting *United States v. Hunt*, 37 M.J. 344, 347 (C.M.A. 1993)) (additional citations omitted). The CAAF "has held that 'on or about' connotes a range of days to weeks." *Id.* (citing *United States v. Barner*, 56 M.J. 131, 137 (C.A.A.F. 2001) (involving a difference of "two to three days"); *Hunt*, 37 M.J. at 346–47 (involving a difference of three weeks); *United States v. Brown*, 34 M.J. 105, 106, 110

(C.M.A. 1992) (involving a difference of seven days)); *see also Brown*, 34 M.J. at 110 ("'On or about' . . . are words of art in pleading which generally connote any time within a few weeks of the 'on or about' date." (citations omitted)), *overruled on other grounds by United States v. Reese*, 76 M.J. 297, 332 (C.A.A.F. 2017).

In *United States v. Parker*, the Government charged the appellant with, *inter alia*, committing rape and adultery in February or March of 1995. 59 M.J. 195, 197 (C.A.A.F. 2003). However, the deposition of the alleged victim introduced at trial indicated the offenses occurred in February or March of 1993. *Id.* at 198–99. After the prosecution rested, the defense moved for a finding of not guilty pursuant to Rule for Courts-Martial (R.C.M.) 917; the military judge denied the motion. *Id.* at 199–200. The court members found the appellant guilty by exceptions and substitutions of committing the rape and adultery between August 1993 and March 1995. *Id.* at 200. The CAAF reversed Appellant's convictions for these two offenses and dismissed those specifications. *Id.* at 201. The CAAF explained that the Government, having chosen not to withdraw the specifications in light of the discrepancy between charged time frame and the deposition, "was required to prove in its case-in-chief that there was improper sexual activity between [a]ppellant and Ms. AL during the charged period in 1995." *Id.* Because "[p]roof of improper sexual activity in 1993, without more, did not demonstrate directly or by reasonable inference that [the a]ppellant engaged in sexual activity with [the alleged victim] in 1995 . . . the Government's case was legally insufficient under R.C.M. 917 to prove" the appellant committed these two offenses, and "[t]he military judge erred by not granting the motion to dismiss those specifications." *Id.*

### b. Analysis

Appellant contends the finding of guilty as to Specification 1 of Charge II is legally and factually insufficient because the Government failed to prove the offense occurred "between on or about 1 October 2015 and on or about 30 November 2015." We agree with Appellant the finding of guilty is not factually sufficient.

CH was the sole witness who provided evidence as to this specification, testifying about events that occurred when she was 12 years old more than seven years after the fact. As described in the Background, *supra*, CH could not recall when exactly this incident occurred. She testified it was after her mother became pregnant in January 2015, but before her mother gave birth in late September 2015. CH initially testified it occurred in "roughly spring/summer of 2015," and later described it as "during spring [or] early summer." CH also remembered the weather was not cold and "was good for T-shirts and basketball shorts and anything." At a later point, CH estimated her mother was "probably five [or] six months" pregnant at the time of the offense.

In order to convict Appellant of the specification as charged, the Government was required to prove beyond a reasonable doubt the offense occurred no earlier than "on or about" 1 October 2015. *See Parker*, 59 M.J. at 201 (holding the Government's failure to prove the charged misconduct occurred during the charged date range rendered the evidence "legally insufficient"). As Appellant notes, all of the evidence indicates the offense occurred before 1 October 2015. The essential question, then, is whether the Government proved the offense occurred "on or about" that date.

The CAAF recently restated that "on or about" indicates "a range of days to weeks." *Simmons*, 82 M.J. at 139 (citation omitted). In *Simmons*, the CAAF found that amending the charged time frame of a specification by adding 279 days was not "reasonably near" the original charged dates. *Id.* at 140 (citations omitted). On the other hand, the Government draws our attention to *United States v. Marrie*, where our predecessor court affirmed a finding of guilty where the appellant was charged with committing an offense "on or about November 1990" but the evidence established it occurred on 15 February 1991. 39 M.J. 993, 1002 (A.F.C.M.R. 1994). The analysis in *Marrie* on this point was rather terse and did not specifically address legal and factual sufficiency;[18] nevertheless, *Marrie* can be read to imply that charging "on or about" may be sufficient to capture a two-and-a-half-month variation between the alleged specification and the proof at trial. Whether *Marrie* remains a valid precedent in this respect in light of the CAAF's explanation in *Simmons* that "on or about" indicates days or weeks rather than months may be open to question. However, assuming *arguendo* that it is, the Government failed to prove the offense occurred within two-and-a-half months of 1 October 2015.

Considering CH's testimony as a whole, perhaps the best estimate as to when the incident occurred is June 2015. This would be consistent with her estimate of "spring [or] early summer," during warm weather, when her mother RP was approximately five months pregnant. However, June 2015 would have been at least three months before 1 October 2015. CH's testimony leaves the possibility that the offense occurred in July 2015 or later, closer in time to 1 October 2015. Yet, given the uncertainty of CH's testimony regarding the date, it is also possible the offense occurred earlier in the spring, perhaps

---

[18] The court addressed the appellant's contention that the evidence constituted a fatal variance, rather than analyzing the legal and factual sufficiency of the evidence per se. *Marrie*, 39 M.J. at 1002. However, by affirming this finding of guilty, the court necessarily implied it found the evidence legally and factually sufficient. *See id.* at 1004; *see also United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) ("[U]nder Article 66(c) of the Uniform Code, 10 U.S.C. § 866(c), the Court of Military Review has the duty of determining not only the legal sufficiency of the evidence but also its factual sufficiency.").

in April or May 2015. The essential point is that in order to convict Appellant, the Government was required to do more than prove the facts alleged in the specification *could* be true; it was required to prove the specification—including the alleged dates of the offense—true *beyond a reasonable doubt. Cf. United States v. Gilliam*, ARMY 20180209, 2020 CCA LEXIS 236, at *8–11 (A. Ct. Crim. App. 15 Jul. 2020) (unpub. op.) ("Because the evidence reveals the distinct possibility that all of the acts of digital penetration could have happened approximately eleven months after the last date charged . . . we are not convinced beyond a reasonable doubt that they occurred within or even reasonably near to the timeframes charged by the government.").

As a matter of factual insufficiency, we are not persuaded the Government proved beyond a reasonable doubt Appellant committed the offense alleged in Specification 1 of Charge II "between on or about 1 October 2015 and on or about 30 November 2015," as alleged. Moreover, a CCA cannot except or substitute "language [in] a specification in such a way that creates a broader or different offense than the offense charged at trial." *United States v. English*, 79 M.J. 116, 121 (C.A.A.F. 2019) (citation omitted). Accordingly, the finding of guilty as to Specification 1 of Charge II must be set aside.

### D. Appellate Delay

Appellant's record of trial was originally docketed with this court on 1 March 2023. Appellant requested and was granted 11 enlargements of time to file his assignments of error, over the Government's opposition, before filing his brief on 24 April 2024. The Government filed a timely answer brief on 28 May 2024, and Appellant filed a reply brief on 4 June 2024.

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the Court of Criminal Appeals." *Id.* at 142. Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the

delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We review de novo an appellant's entitlement to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *Moreno*, 63 M.J. at 135).

Over 18 months have elapsed since Appellant's record of trial was originally docketed with this court. Therefore, under *Moreno*, there is a facially unreasonable delay, although we note the 18-month threshold has been exceeded by less than one month. Accordingly, we have considered the *Barker* factors and find no violation of Appellant's due process rights. Appellant has not specifically alleged cognizable prejudice, and we do not find any at this stage. With regard to oppressive incarceration, we recognize Appellant entered confinement on 8 December 2022 and we have set aside the adjudged sentence; however, it remains to be seen whether and to what extent Appellant's adjudged 17-year term of confinement may be reduced upon a rehearing. In addition, we do not perceive any particularized anxiety or concern, nor any particular reason why Appellant's defense at a sentence rehearing or future appeal might be impaired due to the delay. Absent prejudice, we find the delay involved in Appellant's case has not been so egregious as to adversely affect the perception of the military justice system.[19] The record of Appellant's court-martial is substantial, including nearly one thousand pages of written transcript, and the delay in adjudicating Appellant's appeal is primarily due to Appellant's own motions for enlargements of time. Accordingly, we find no violation of Appellant's due process rights. Furthermore, recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), we conclude no such relief is warranted.

**E. Remedy**

Having modified the findings, we have considered whether we may reliably reassess Appellant's sentence or, instead, return the record and authorize a rehearing as to the sentence. *See United States v. Winckelmann*, 73 M.J. 11, 15–16 (C.A.A.F. 2013). We conclude remand is appropriate.

---

[19] Assuming *arguendo* the possibility Appellant's term of confinement on rehearing might be reduced below the amount of confinement he actually serves is sufficient to demonstrate oppressive incarceration, balancing the remaining *Barker* factors, we would still find no due process violation.

We begin our analysis with the four non-exclusive factors set forth in *Winckelmann. Id.* As to the first factor, the "penalty landscape and [Appellant's] exposure" have not changed dramatically. With Specification 1 of Charge II set aside, because Appellant remains convicted of the rape of AD Appellant's maximum sentence remains a dishonorable discharge, confinement for life without the possibility of parole, total forfeiture of pay and allowances, reduction to the grade of E-1, and a reprimand; however, the dishonorable discharge is no longer mandatory. *See* 2012 *MCM*, pt. IV, ¶ 45b.e.(1); *Manual for Courts-Martial, United States* (2008 ed.), App. 12. This factor favors reassessment.

As to the second factor, Appellant was sentenced by court members rather than a military judge. "As a matter of logic, judges of the [C]ourts of [C]riminal [A]ppeals are more likely to be certain of what a military judge would have done as opposed to members." *Winckelmann*, 73 M.J. at 16. This factor favors remand.

Consideration of the third factor—"[w]hether the nature of the remaining offenses capture the gravamen of criminal conduct included within the original offenses and, in related manner, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses"—leads to mixed conclusions. *Id.* On one hand, Appellant remains convicted of four other offenses, including three sexual offenses, and the bulk of the evidence introduced at trial would remain admissible. On the other hand, the court members likely viewed the rape of CH as the most serious offense because the victim was Appellant's 12-year-old stepdaughter who lived with him. Moreover, it was the only penetrative sexual offense against a child and the only sexual offense against CH of which Appellant was convicted. The court members might have found it particularly aggravated in that it was the first time Appellant sexually abused CH while she pretended to sleep, and was followed by a lengthy pattern of uncharged instances of Appellant touching CH's breast or "vaginal area" while she was sleeping. On balance, we find this factor slightly favors remand.

As to the fourth factor, the remaining Article 120 and 128, UCMJ, offenses are of the type that the judges of this court have "experience and familiarity with." *Id.* This factor favors reassessment.

However, recognizing the *Winckelmann* factors are not dispositive but illustrative considerations to be assessed alongside the other circumstances arising in each case, we find other considerations favor remand in this case. The court members sentenced Appellant to confinement for 17 years. Clearly, the court members found a very substantial term of confinement was warranted. Yet what part Specification 1 of Charge II, the rape of a child, played in the adjudged confinement is difficult to discern. Our responsibility in

reassessing is to approve a sentence no greater than that which the original court-martial would have approved absent the error. Thus, we must be sure the reassessed sentence is low enough to ensure Appellant suffered no prejudice from the erroneous finding of guilty. However, if we affirm a sentence substantially lower than what the court members would have imposed, we risk giving inadequate weight to the severity of the remaining offenses.

Under the particular circumstances of this case, considering *inter alia* that we are setting aside Appellant's conviction for arguably the most serious offense, and our uncertainty as to what the court members might have done, we find remand for a new sentencing proceeding is appropriate.

### III. CONCLUSION

The finding of guilty as to rape of a child in Specification 1 of Charge II and the sentence are **SET ASIDE**. Specification 1 of Charge II and Charge II are **DISMISSED WITH PREJUDICE**. The remaining findings of guilty are **AFFIRMED**. A rehearing as to the sentence is authorized. The record is returned to The Judge Advocate General for further proceedings consistent with this opinion. We will complete our Article 66, UCMJ, 10 U.S.C. § 866, review when the record is returned to the court.

WARREN, Judge (concurring in part and in the judgment):

Today we reverse a conviction not because of failure of the Government's proof as to an essential element, but because of the inaccuracy of the Government's pleading as to an ancillary fact. That is to say, we are compelled to set aside Appellant's conviction for digitally penetrating his then 12-year-old stepdaughter *not* because he did not sexually abuse her as alleged in 2015, but because the Government pleaded the wrong months for that offense in the specification. I concur only in the judgment of the court insofar as we are bound by precedent to conclude that the Government's evidence is "factually insufficient" due to a mere pleading error—notwithstanding the fact that the Government's proof at trial established the *statutory elements* (vice non-conforming surplusage[1] in the pleading) beyond a reasonable doubt.

---

[1] For the reasons set forth *infra* in my concurrence, absent precedent from our superior court in *United States v. Parker*, 59 M.J. 195 (C.A.A.F. 2003), *United States v. English*, 79 M.J. 116, (C.A.A.F. 2019), and *United States v. Simmons*, 82 M.J. 134 (C.A.A.F. 2022), I would treat the articulation of the date of the offense as mere *surplusage* (*i.e.*, language unnecessary to aver an essential element of the charged offenses) and

But for our superior court's precedent in *United States v. English*, 79 M.J. 116 (C.A.A.F. 2019), and *United States v. Parker*, 59 M.J. 195 (C.A.A.F. 2003), I would have adjudicated this case by applying five principles:

- The Government's burden of proof pertains only to elements, not ancillary facts (*i.e.*, surplusage). *See* Rule for Courts-Martial (R.C.M.) 920(e)(5)(D); *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (factual sufficiency review evaluates whether evidence at trial proved each required element of the offense beyond a reasonable doubt (citation omitted)).

- The date of an offense is generally only an ancillary fact (*i.e.*, relevant to jurisdiction over the offense and offender, but not itself an element), and need only be pleaded when it is an "essential element of the offense" (*i.e.*, when time is of the essence for the offense). *See United States v. Williams*, 40 M.J. 379, 382 (C.M.A. 1994) (citations omitted).

- To the extent a date is an "essential element" of child sex offenses because the element requires a victim to be under a certain age, that element is satisfied if the proof demonstrates it occurred anywhere in that age range (*i.e.*, any time prior to the child turning 16 years of age). *See* Articles 120b(d)(2), (h)(4), Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920b(d)(2), (h)(4) (*Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*)); 2019 *MCM*, pt. IV, ¶ 62.a (prohibiting sexual acts with a child and defining child as "any person who has not attained the age of 16").

- Inaccurate charging language involving date ranges that does not change the nature of an offense is a "variance" issue, not a proof issue. *See United States v. Teffeau*, 58 M.J. 62, 66 (C.A.A.F. 2003) (stating "[m]inor variances, such as the location of the offense or the date upon which an offense is allegedly committed,

_____

therefore language that the Government is not obligated to prove beyond a reasonable doubt. *See United States v. Heppermann*, 82 M.J. 794, 802 n.12 (A.F. Ct. Crim. App. 2022) (citing *United States v. Duke*, 37 C.M.R. 80, 84 (C.M.A. 1966)) (additional citations omitted), *rev. denied*, 83 M.J. 103 (C.A.A.F. 2022); *see also United States v. Miller*, 471 U.S. 130, 136 (1985) ("A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a 'useless averment' that 'may be ignored.'" (citation omitted)); *cf. English*, 79 M.J. at 120 (finding the Government was required to prove alleged facts which "narrowed the scope of the charged offense," specifically the type of force used in an assault (citations omitted)).

do not necessarily change the nature of the offense and in turn are not necessarily fatal" (citations omitted)); *United States v. Allen*, 50 M.J. 84, 86 (C.A.A.F. 1999) ("A variance between pleadings and proof exists when evidence at trial establishes the commission of a criminal offense by the accused, but the proof does not conform strictly with the offense alleged in the charge." (citation omitted)).

- Even material variances with regard to divergences in dates of the offense pleaded from the evidence at trial only become reversible error when the accused was misled by and then detrimentally relied upon the pleading's divergent dates such that he was materially inhibited from either: (a) presenting a relevant defense theory, (b) presenting his own evidence/witness(es), or (c) pursuing a relevant line of inquiry in cross-examining a government witness. *See United States v. Simmons*, 82 M.J. 134, 141 (C.A.A.F. 2022).[2]

Applying that framework, but for *English* and *Parker* I would have held that the Government's proof established both elements of the Article 120b, UCMJ, 10 U.S.C. § 920b, offense as to CH. In the absence of *English*, I would have excepted the charged date range as unnecessary surplusage from the

---

[2] I acknowledge that since *United States v. Reese*, 76 M.J. 297, 302 (C.A.A.F. 2017), the United States Court of Appeals for the Armed Forces (CAAF) now eschews a "prejudice" analysis for such variances. The CAAF explicitly overruled prior precedent in *United States v. Sullivan*, 42 M.J. 360, 365 (C.A.A.F. 1995), which concluded that no change to charging language was "major" unless the "substantial rights of the defendant are [ ] prejudiced." *See also Reese*, 76 M.J. at 302 (reciting the holding for, and then overruling, *Sullivan*). However, while the CAAF now frames the analysis in terms of whether a "material variance" in the dates pleaded to the dates proved (*i.e.*, whether the divergent dates fall within the permissible "days or weeks" timeframe endorsed by the CAAF in *Simmons*) creates a "major change" to the specification, the factors involved in considering whether a change is "major" appear to still include what impact, if any, it had on an appellant's ability to effectively prepare for and present a defense at trial:

> We conclude that this change in the Government's theory of the case, which was directly predicated on—and inextricably linked with—the amended dates in the charge sheet likely misled the accused as to the offenses which he needed to defend against. Specifically, the change in dates likely affected the investigation the defense team otherwise might have conducted, the type of evidence they otherwise might have introduced, and the nature of the cross-examination they otherwise might have conducted.

*Simmons*, 82 M.J. at 140–41.

specification. I would then have conducted a "variance" analysis and held that while the delta between the charged and proved timeframe was beyond the scope of inclusion for "on or about" language deemed acceptable by the CAAF in *Simmons*, there was still no "material variance" because Appellant was on actual notice of the lone instance charged in the specification. Closing arguments by both trial counsel and trial defense counsel demonstrate that their focus was on the credibility of CH's assertions, not a litigation of the accuracy of the charged time range. Under these circumstances, the Government proved the statutory elements that CH was over the age of 12 and had not attained the age of 16 years at the time Appellant digitally penetrated her vulva in 2015, *and* Appellant was not misled as to the underlying event at issue by virtue of the charge. Further, Appellant was not prevented from presenting a defense, nor denied the protection from double jeopardy by the combination of the charging language and the evidence presented at trial. *See United States v. Lee*, 1 M.J. 15, 17 (C.M.A. 1975) ("[P]rotection against double jeopardy can be predicated upon the evidence in the record of the prior prosecution."). I would hold the proof factually sufficient, and the variance immaterial.

Instead, the current state of the law is that the date of an offense is accorded the status of an element due in part to our superior court's decision in *Parker*. *Parker* is of course binding precedent on us unless and until our superior court decides otherwise. However, our status as a subordinate court does not render us mute. In accordance with our superior court's suggestion in *United States v. Allbery*, 44 M.J. 226, 228 (C.A.A.F. 1996), that while a Court for Criminal Appeals (CCA) is obligated to follow binding precedent from the United States Court of Appeals for the Armed Forces (CAAF), the CCA may still "urge reconsideration of [the CAAF's] precedent." *Id.* (citation omitted). I respectfully invite the CAAF to revisit its determination in: (1) *Parker*, that the date of a sexual offense is (in effect) an essential element of the offense; and (2) *English*, that appellate courts may not make exceptions and substitutions on appeal, even where those exceptions and substitutions pertain not to the elements of the offense, but merely other non-elemental pleading language present in the specification solely for the purpose of facilitating notice of the charged misconduct.[3] In particular, I respectfully invite the CAAF to revisit

---

[3] I observe that on this score, standing alone, *English* might be distinguishable. In *English*, the United States Army Court of Criminal Appeals (ACCA) originally affirmed an Article 120, UCMJ, conviction for the appellant forcing the victim to perform nonconsensual oral sex on him, but excepted the words "grabbing her head with his hands"—concluding that while the evidence supported that appellant forced the victim to perform oral sex on him, it did not support that he did so by using his hands to force down her head upon him. *United States v. English*, 78 M.J. 569, 576 (A. Ct. Crim. App.

any suggestion in their caselaw that, outside of a narrow range of cases, the date of an offense is an "essential element" of any offense, and that divergence between dates charged and dates proved would constitute any legal or factual insufficiency of the evidence.[4] In so doing I am essentially inviting our superior court to return to its prior precedent which held that when divergences between the dates charged and the dates proved at trial do not change the fundamental nature of the charge (*e.g.*, "time of war" offenses or crimes against children where the victim being less than a particular age is a required element), such divergences should be reviewed for what they are—"variances," not failures of "proof."

Turning first to whether the date of an offense is generally an element of the offense, previously our superior court held that the date of an offense is

---

2018). Our superior court then reversed, holding that in excepting that mechanism of force language from the specification, the ACCA had created a material variance between the pleading and proof at trial. *English*, 79 M.J. at 121. Unlike *English,* where striking the language articulating the mechanism of "force" used arguably allowed more license for the Government to prove unlawful force at trial, here striking the words from the specification "between on or about 1 October and on or about 30 November 2015" would not expand the scope of the charged misconduct where the mechanism of the crime remained the same, and the date change divergence did not place the alleged child sexual assault in a higher punishment category. All of which is to say, while the Government's charging language in the case before us alleged that CH was 12 years and 10–11 months old at the time of the offense, the proof at trial demonstrated that she was only 12 years and 5–6 months old at the time of the offense—that did not change the nature of the offense because ultimately the statute merely requires that the Government prove that Appellant engaged in a sexual act with CH while she was over the age of 12 and had not yet attained the age of 16—the proof at trial did that. However, even if *English* could be distinguished, *Parker* currently forecloses the theory given its holding that divergence in the dates proved constituted failure of an essential element of the offense within the meaning of R.C.M. 917.

[4] I distinguish here between two separate defects which could result in reversal of a specification on appeal: (1) factual/legal sufficiency dealing with the adequacy of the Government's proof of the essential elements of an offense; and (2) material variances between the proof adduced at trial which, while factually and legally sufficient to prove the statutory elements, diverges so significantly from the charging language that it deprives Appellant of due process notice of the nature of the charge and materially frustrates his constitutional right to present a defense to the charge. I am not calling upon the CAAF to reverse their holding in *Simmons* that a 279-day divergence is not fairly encompassed within "on or about" charging language, nor their conclusion that the divergent charging language constituted a material variance under the unique circumstances in that case, 82 M.J. at 141; rather, I am merely respectfully inviting the court to consider the implications of its decisions in *Parker*, *English*, and *Simmons* vis-a-vis conflation of what I would classify as "proof problems" (factual/legal sufficiency analysis) versus "pleading problems" (variance analysis).

generally not an essential element of an offense under the Uniform Code of Military Justice (Code) unless time was of the essence to the offense:

> Where time *is* of the essence of the crime, allegations concerning the date of the offense become matters of substance. For example, the date of the offense would doubtless be of substance in a prosecution for violating a Sunday "blue law," or possibly in a prosecution for statutory rape. In these instances, amendments which would have the effect of charging the accused with an additional offense, or of changing the nature of the crime alleged, are not permitted. On the other hand, where time is *not* of the essence, it is the general rule that an erroneous statement of the date of the offense constitutes a matter of mere form, and amendments are freely permitted where they do not operate to change the nature of the crime charged, and *there is no showing that the defendant had been misled* or prejudiced in his defense on the merits.

*United States v. Brown*, 16 C.M.R. 257, 261–62 (C.M.A. 1954) (third emphasis added) (citations omitted); *see also Williams*, 40 M.J. at 382 ("[N]either Article 125 nor 134 of the Code makes time a material element for appellant's criminal offenses.").[5] *Williams* in particular was considering whether the denial of a bill of particulars where the defense demanded the Government specify the precise date on which the sexual assault occurred within the two-month charging window because the absence of that information deprived the accused of Fifth Amendment[6] Due Process. 40 M.J. at 381–82. The CAAF found no due process violation, in part because "[c]ourts have consistently held that unless the date is an essential element of the offense, an exact date need not be alleged." *Id.* at 382 (citations omitted). Furthermore, the CAAF found no violation of the appellant's Sixth Amendment[7] right to present a defense because he was still able to challenge the victim's memory as to the alleged dates of the offenses during

---

[5] The CAAF did not overrule *Brown* in *Simmons*—it simply distinguished it. *See Simmons*, 82 M.J. at 140; *see also United States v. Stout*, 79 M.J. 168, 174 (C.A.A.F. 2019) (Maggs, J., concurring in the judgment) ("Changes to the [*Manual for Courts-Martial*] since *Brown* was decided also have not rendered *Brown* obsolete.").

[6] U.S. CONST. amend. V.

[7] U.S. CONST. amend. VI.

cross-examination at trial and use that uncertainty to attack her credibility. *See id.* at 383.[8]

The CAAF appeared to retreat from that rationale in *Parker*. In *Parker*, the CAAF held that a rape case was "legally insufficient under R.C.M. 917" where the proof at trial demonstrated that, *inter alia*, appellant raped his adult victim in 1993, but the specification alleged he did so in 1995. 59 M.J at 201. Interestingly, *Parker* could have been analyzed as a "variance" case because the court members convicted Appellant by exceptions and substitutions as to the date (substituting in language to amend the charged time frame from "between 1 February and 31 March 1995" to "between 1 August 1993 and 31 March 1995", *id.* at 197, 200), but the court did not analyze it that way. Instead, they analyzed it as an error by the military judge in applying R.C.M. 917, which only mandates a finding of not guilty prior to verdict "in the absence of some evidence which . . . could reasonably tend to establish each and every *essential element* of an offense charged." *Id.* at 200 (emphasis added) (quoting R.C.M. 917). By finding a legal insufficiency based solely upon proof of a divergent date of the single-instance offense, the only conclusion to be drawn is that the court in *Parker* considered the alleged date of the offense (contrary to prior precedent in *Williams*) as an "essential element" of the offense.

The issue I take with our superior court's decisions in *Parker* and *English* is that they conflate pleading errors with proof errors. That is to say, the court insists that the language of the pleading supersedes the statutory elements of an offense, asserting that an "[a]ppellant [is] entitled to rely on the specifications in the charge sheet as drafted." *See English*, 79 M.J. at 120–21 (citing *United States v. Reese*, 76 M.J. 297, 300–01 (C.A.A.F. 2017); *United States v. Morton*, 69 M.J. 12, 16 (C.A.A.F. 2010); *United States v. Medina*, 66 M.J. 21, 26–27 (C.A.A.F. 2008)). It is true enough that an appellant is entitled to rely upon the language of the specification for *reasonable notice* of the charged

---

[8] The CCAs generally agree with the concept that the date of an offense is generally not an element of an offense. *See United States v. Rogers*, 76 M.J. 621, 626 (A.F. Ct. Crim. App. 2017) (in the context of determining the date of an offense for purposes of applying the correct version of Article 60, UCMJ, reasoning: "We decline to adopt a *Walters*-like requirement that the court-martial make a special finding with respect to the date of an offense because, as noted above, the offense date is not an element of the crime."); *United States v. Aguirre*, ARMY 20090487, 2012 CCA LEXIS 209, at *25 (A. Ct. Crim. App. 1 Jun. 2012) (unpub. op.) ("The date of occurrence of this specific incident is not an element of either the charged Article 120, UCMJ, offense or the lesser-included Article 128, UCMJ, offense."); *United States v. Harris*, 52 M.J. 665, 667 (A. Ct. Crim. App. 2000) (holding that a specification alleging a 23-month time window did not render the specification defective or vague because "[t]he date was not an element of the offense [Article 120, UCMJ, carnal knowledge] here").

misconduct, but surplusage language of a specification cannot change the underlying statutory element which it is meant to describe.[9]

As our superior court has reminded us before, it is the statutory language that creates elements because "it is for Congress to define criminal offenses and their constituent parts." *United States v. Jones*, 68 M.J. 465, 468 (C.A.A.F. 2010) (citation omitted).[10] Language unnecessary to aver that element "can generally be disregarded as surplusage." *United States v. Heppermann*, 82 M.J. 794, 802 n.12 (A.F. Ct. Crim. App. 2022) (quoting *United States v. Duke*, 37 C.M.R. 80, 84 (C.M.A. 1966)) (additional citations omitted), *rev. denied*, 83 M.J. 103 (C.A.A.F. 2022); *see also United States v. Miller,* 471 U.S. 130, 136 (1985) ("A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a 'useless averment' that 'may be ignored.'" (citation omitted)).

The statutory element here is that the victim was a child over the age of 12 and had not attained the age of 16 years. *See* Article 120b(a)(2), UCMJ ("Any person subject to this chapter who . . . commits a sexual act upon a child who has attained the age of 12 years . . . ."); Article 120b(d)(2), UCMJ (defining a child as a person under the age of 16 years). To that extent, the date the offense

---

[9] This does not mean that divergence between the pleaded language and the proof at trial is of no moment. The exceptions and substitutions doctrine is meant to align the proof at trial with the language of the specification. When that divergence is too great it constitutes a "material variance" and when that material variance constitutes a "major change" the verdict is not permitted to stand. That is not, strictly speaking, because the proof as to the elements was flawed, but rather that the language of the pleading inaccurately pleaded those elements. It is only when this inaccurate pleading misleads the accused as to the nature of the offense, that it adversely affects his constitutional right to both reasonable notice of the offense and reasonable opportunity to present a lawful defense thereto. *See, e.g.*, *Simmons*, 82 M.J. at 140–41.

[10] The President's illustrative recital of "elements" agrees that the element is only that the child was under 16 at the time of the offense—not that the offense must have occurred on any particular day during the timeframe. *See Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 62.a(b)(2). While the President's illustrative listing of elements for enumerated punitive articles is not binding, *see Jones*, 68 M.J. at 471–72 (citations omitted), likewise the sample specification for this offense, wherein the President recommends alleging a date certain, does not govern whether recital of a specific date is therefore necessary to lawfully state the offense (*i.e.*, to conform with R.C.M. 307(c)(3)'s command that a specification expressly or by implication allege all elements of an offense). *See United States v. Fosler*, 70 M.J. 225, 231 (C.A.A.F. 2011) (holding that trial counsel's reliance upon the 2008 *Manual for Courts-Martial* sample specification for Article 134, UCMJ, offenses which omitted the terminal element still failed to properly allege all elements of the offense because "[t]he interpretation of substantive offenses in Part IV of the Manual is not binding on the judiciary." (quoting *United States v. Mitchell*, 66 M.J. 176, 179 (C.A.A.F. 2008)).

was committed matters as to the sufficiency of the Government's proof that the child victim had not attained the age of 16 years at the time. Strictly speaking though, alleging a *specific date* is not required to properly allege the elements of the offense. The elements of the offense are alleged by designating the alleged victim as a "a child who had attained the age of 12 years but had not attained the age of 16 years" in the language of the specification. After all, it remains the case that "[t]he military is a notice pleading jurisdiction," and therefore "[a] charge and specification will be found sufficient if they, 'first, contain[ ] the elements of the offense charged and fairly inform[ ] a defendant of the charge against which he must defend, and, second, enable[ ] him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F. 2011) (third, fourth, and fifth alterations in original) (citations omitted).

The language of the specification is simply the way in which the Government claims that an accused violated statutory elements of a crime. The language of the pleading is important, because an accused has a due process right to notice as to the nature of the allegations so that he may have a reasonable opportunity to prepare his defense and protect against double jeopardy. *See* R.C.M. 307(c)(3); *United States v. Turner*, 79 M.J. 401, 403 (C.A.A.F. 2020) (citations omitted). However, a pleading cannot change the *statutory elements* of an offense. The Government is not obligated to prove mere surplusage in a specification.

My view is that whereas "factual sufficiency" is supposed to be about failures of proof as to required statutory elements and "fatal variances" are supposed to be about deficiencies in pleading that deprive an appellant of due process by depriving him of reasonable notice and opportunity to formulate a defense, *Parker* and *English* conflate the two by construing the date of an offense as an element of the offense. *Simmons* then amplifies that conflation by suggesting that charging language is elementally incomplete without alleging a specific date: "[s]tating on a charge sheet the date of an alleged offense with a certain degree of specificity and accuracy is required." *Simmons*, 82 M.J. at 141.

In dutifully applying *Parker* and *English* the majority opinion conforms to the role of an intermediate appellate court, that is, to apply vertical stare decisis, regardless of whether it agrees with that precedent. However, as our superior court recognized in *Allbery*, CCAs need not remain silent in the face of problematic precedent. 44 M.J. at 228. Rather, when confronted with binding precedent which the CCA perceives to be wrongly decided our superior court suggested the CCA raise that to the CAAF's attention: "If [the CCA] believed that the underlying logic of that decision had changed in the meantime, its

recourse was to express that viewpoint and to urge [CAAF's] reconsideration of [its] precedent." *Id.*

Harkening to the CAAF's call in *Allbery*, I respectfully submit that: (1) *Parker* conflated this fundamental distinction between proof and pleading; (2) *English* compounded that error by forbidding CCAs to conform the findings language to the proof at trial via exceptions and substitutions involving the same offense on appeal; and (3) that error was recently amplified by the Court's dicta at the conclusion of *Simmons* declaring that all charge sheets must allege a date certain for the charged offenses (heedless of the fact that in most instances, the date of an offense is *not* an element of that offense). Nonetheless, as the United States Supreme Court continues to hold, mere errors in pleading ought not mandate dismissal of factually and legally sufficient charges absent material prejudice to an accused. *See, e.g., United States v. Cotton*, 535 U.S. 625, 631–32 (2002) (holding the omission of a fact in a federal indictment that would enhance the maximum sentence (to wit: the quantity of drugs distributed by the appellant) is not a jurisdictional error and not a justification for a vacation of the sentence).

For all these reasons, while I am duty bound by vertical stare decisis to concur in the judgment in this case, I respectfully request that our superior court re-examine their precedents in *Parker*, *English*, and *Simmons*. Combined, these cases currently produce the anomalous result in this case (and perhaps future cases) of reversing a conviction where the Government's proof satisfies every statutory element of the offense, and the divergent surplusage charging language did nothing to materially alter the nature of the charge, nor materially impair reasonable notice of the charged misconduct and the ability to present a defense.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court